# JACK SINDORF *v.* JACRON SALES CO., INC.

[No. 257, September Term, 1974.]

*Decided June 25, 1975.*

54

The cause was argued on November 4, 1974, and reargued on April 7, 1975, before ORTH, C. J., and GILBERT and LOWE, JJ.

Argued and reargued by *Barry J. Nace*, with whom were *Davis & Nace* on the brief, for appellant.

Argued by *Thomas E. Donahue*, with whom were *Koepenick, Patterson, Schuman & Donahue* on the brief, for appellee. Reargued by *Albert D. Brault*, with whom were *Brault, Scott & Brault* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

"The security of his reputation or good name from the arts [1] of detraction and slander, are rights to which every man is entitled by reason and natural justice; since, without these, it is impossible to have the perfect enjoyment of any other advantage or right." 1 W. Blackstone, *Commentaries* *134.

JACK SINDORF felt that his right to personal security had been violated by the defamation of his reputation and good name by a corporation upon the spoken words of one of its employees, Robert Fridkis. Seeking balm for his hurt, he instituted an action at law in the Circuit Court for Prince George's County for the tort of slander, demanding judgment against the corporation and Fridkis, and each of them, in the amount of $150,000 compensatory damages and $150,000 punitive damages. He did not prevail. Fridkis was dismissed from the action prior to trial and a judgment was entered in his favor for costs.[2] A verdict in favor of the corporation, which went to trial on a plea of the general issue, was directed by the trial judge at the close of all the evidence. Sindorf appealed from the judgment entered thereon in favor of the corporation for costs.[3]

---

1. In the *Gavit* edition of the work, p. 71, the word "venom" is used instead of "arts".

2. Fridkis filed a motion raising the preliminary objection that the court was without jurisdiction under Code, Art. 75, § 96 (a) (4). The statute provided that a court may exercise personal jurisdiction over a person as to a cause of action arising from the person's causing tortious injury in this State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in this State or derives substantial revenue from food or services used or consumed in this State. Fridkis alleged that the tortious action occurred outside the State and that the requirements for personal jurisdiction over him were not met in fact nor did the declaration aver that they were. Upon hearing on 29 November 1973 the motion was granted. Judgment *nisi* for costs was entered in favor of Fridkis the same day, and final judgment was entered on 5 December. Sindorf did not appeal from this judgment. Fridkis died before trial.

We note that Art. 75, § 96 was repealed by Acts 1973, 1st Spec. Sess., ch. 2, § 2, effective 1 January 1974. It now appears as Courts Art. § 6-103 (b) with stylistic revision.

3. Sindorf noted the appeal on 29 April "from the judgment entered in this action on April 4, 1974," which was the judgment *nisi*. Of course, appeal must be from a final judgment. Courts Art. § 12-301. We entertain the appeal as properly taken for the reasons set out in *Shipp v. Autoville Limited*, 23 Md. App. 555.

*The Identity of the Corporate Defendant-Appellee*

There was confusion about the identity of the corporation Sindorf sued. The corporate defendant named in the declaration was "Jacron Sales Co., Inc." and in the caption its address was given as "5801 Torresdale Ave., Philadelphia, Pa. 19135." The declaration averred that "Jacron Sales Co., Inc. is a corporation with a principal place of business in Philadelphia, Pennsylvania," and that Fridkis "is an employee, agent or servant of the Defendant Jacron Sales Co., Inc. with a principal place of business at the address indicated in the caption hereof." The general issue plea filed by Jacron Sales Co., Inc. gave the same address in the caption as did the declaration. Sindorf propounded interrogatories to Jacron Sales Co., Inc. on 3 January 1974. Interrogatory #6 asked for each date that Robert Fridkis had occasion to be at the Philadelphia office of defendant corporation between January and July of 1973. The answer was "Jacron Sales Company, Inc., the Defendant corporation, is a Virginia corporation and has no Philadelphia office. The address listed in the Plaintiff's Declaration is not correct." Excepting to this answer, and others, Sindorf moved to strike it, stating that "Defendant's assertion that they have no Philadelphia office is a guise and sham upon this court . . . ." Jacron Sales Company, Inc. replied to this motion:

> "It should be clear at the outset that the Defendant should not be required to bear the burden of Plaintiff's uncertainty as to who it has sued. In the Plaintiff's Declaration, the caption lists the Defendant as Jacron Sales Company, Inc., followed by a Philadelphia address. JACRON SALES COMPANY, INC., is a Virginia corporation, doing business in Virginia, with its principal and only office at 1310 Mt. Vernon Avenue, Alexandria, Virginia. The Defendant is a subsidiary of the Jacron Sales Company, a Pennsylvania Corporation with its principal offices in Philadelphia. The two corporations are separate

and distinct entities and their separateness and distinctness cannot be ignored merely because the Plaintiff finds it convenient to do so rather than making the effort to determine who he should sue.

* * *

The Plaintiff's attorney alleges that the Defendant has perpetrated a sham upon this Court by its answer to interrogatory No. 6. As is stated above, Defendant, JACRON SALES COMPANY, INC. is a Virginia Corporation and is an entity separate from the Jacron Sales Company, a Pennsylvania corporation. The Defendant has no Philadelphia office. The Defendant has no obligation under any of the discovery rules to respond to what the Plaintiff's attorney meant to ask rather than what he did ask." [4]

This answer left no doubt that it was the Virginia Corporation which appeared to contest the slander suit. Although Sindorf neither amended his declaration to correct the address nor effected service on the Virginia corporation, he accepted that the corporation contesting his suit was the Virginia corporation and not the Pennsylvania corporation. A hearing on the motion to strike the answers was held on 27 March 1974.[5] The docket entries under that date as to interrogatory #6 read: "Plaintiff concedes answer is satisfactory." The transcript of the trial clearly shows that the parties considered the Virginia corporation to be the actual defendant. For example, Sindorf argued that there could be no conditional privilege to defame (see *infra*) because the Virginia corporation had never employed him.

---

4. The precise name of each corporation as set out in its articles of incorporation is not evident from the record before us. There is indication that the Pennsylvania corporation owned 51 per cent of the stock of the Virginia corporation and that John Langton held the office of president in each corporation. It is clear that Sindorf was employed by the Pennsylvania corporation and that Fridkis was employed by the Virginia corporation. The record does not disclose what relationship Fridkis had, if any, with the Pennsylvania corporation.

5. The transcript of that hearing is not included in the record submitted to us.

And when there was dispute over the production of a financial statement of the defendant corporation, both the parties and the court considered such a statement to be that of the Virginia corporation.

Sindorf obviously intended to sue the employer of the person who allegedly defamed him. That employer was the Virginia corporation. The original misconception that Fridkis was employed by the Pennsylvania corporation was cleared up by the answers to the interrogatories. It was the Virginia corporation which filed pleadings, appeared at trial, and defended the suit in fact. We think the Virginia corporation waived any objections with reference to its identity by making a general appearance, Maryland Rule 124 a, without making a special or preliminary objection, Rule 124 b and Rule 323. See *McGinnis v. Rogers*, 262 Md. 710; *Eastham v. Young*, 250 Md. 516; *McCormick v. Church*, 219 Md. 422. Any variance between pleading and proof did not mislead or injure the defendant and, therefore, was not fatal. *Phillips v. Haugaard*, 135 Md. 427, 436. See *American Stores Co. v. Byrd*, 229 Md. 5, 15.

We conclude that the defendant below was, and appellee on appeal is, the Virginia corporation, hereinafter referred to as "Jacron".

## The Facts

From the evidence adduced at the trial, we recount the facts and circumstances upon which the cause here is based. Sindorf was employed by the Pennsylvania Jacron for 18 months as a salesman. He resigned on 23 July 1973 because of a dispute over certain sales made by him and commissions he believed due him. The corporation's president, John Langton, testified that "sales discrepancies" had arisen from Sindorf's selling practices. The discrepancies were not financial but resulted from "selling to people without checking credit ratings . . . ." Sindorf testified that he would not receive his commissions from these credit sales until payment had been received for the goods and that uncollectable debts were shared 50/50 by himself and the corporation. He claimed that he had not been paid his

commissions from his charge sales because the corporation said the accounts were not collected. It was these disagreements which culminated in Sindorf's resignation by letter wherein he explained that he was retaining the inventory in his possession "as partial payment of the commissions due me . . . ." Subsequently the corporation initiated criminal proceedings against Sindorf because of his retention of the goods. The disposition of those proceedings is not apparent from the record before us.

A few days after his association with the Pennsylvania corporation terminated, Sindorf was hired by the Tool Box Corporation of Maryland upon an interview with William Brose, president of that company. When Langton learned that Sindorf was working for Tool Box, he called Fridkis, Vice President of the Virginia Jacron. He asked Fridkis to verify Sindorf's current employment and to ascertain whether Sindorf had been working for Tool Box at the same time he had been working for the Pennsylvania Jacron. Langton told Fridkis why Sindorf left the Pennsylvania corporation:

> "We had mentioned that we had discrepancies with him, the sales picture, and the policy of how he would sell against company policies and do whatever he pleased, and that he had left us and in his possession he had taken with him his complete inventory and wouldn't return it to us. He claimed that he would return it when he would get his commission money."

Fridkis called Tool Box to talk to Brose, but Brose was not in. Fridkis asked a secretary, Denise Bennett, if Sindorf was then employed by Tool Box. She was not sure. Fridkis said, "Well, have Bill call me, because we have some things missing and I would like to talk to Bill about Jack." Denise Bennett recalled the conversation. She said there was no indication in the tone of Fridkis's voice that he was "mad, vicious, [or] excited," and he "appeared to be speaking in a normal conversation." She was asked, "What was your thoughts about Mr. Sindorf?" She answered, "I thought he

was a thief." But she admitted that Fridkis had not said that Sindorf had been responsible for the missing articles.

When Brose returned the call, he and Fridkis talked first about routine business matters. Brose testified that he had a "nice" business relationship with Fridkis. Although the Virginia Jacron and Tool Box were competitors, they would, at times, exchange goods and information and buy from and sell to each other. Brose said that if a former employee was employed or was about to be employed by Jacron, he would call Fridkis, discuss the employee and apprise Fridkis of any problems. Eventually the conversation centered on Sindorf. The conversation was recorded by Brose, and a transcript thereof was offered in evidence. We quote that part of the intercourse concerning Sindorf.

"Mr. Fridkis: . . . I want to talk to you about your new salesman, Jack Sindorf

Mr. Brose: yeh

Mr. Fridkis: ah, ah

Mr. Brose: he's been working the Ocean City area

Mr. Fridkis: yeh, you know he, he use to work for Jacron

Mr. Brose: understand in Philadelphia

Mr. Fridkis: yeh, Philadelphia and, ah, there was quite a few cash sales and quite a bit of merchandise that was not accounted for

Mr. Brose: Oh really

Mr. Fridkis: yeh, so I figured I'd, you know

Mr. Brose: Oh good heavens

Mr. Fridkis: So I thought I'd better kind of tip you off about it, you know, watch your stock real, real carefully on trucks and things

Mr. Brose: yeh

Mr. Fridkis: when did you hire him, how long

Mr. Brose: I think today, no officially yesterday I guess

Mr. Fridkis: Oh, officially yesterday

Mr. Brose: uh huh

Mr. Fridkis: Oh, okey cause, ah, ah, someone here says he's been working for you three or four, ah, ah, weeks

Mr. Brose: God, I never met him that long ago

Mr. Fridkis: o.k., o.k.

Mr. Brose: I think, I think the first time I met him was about Thursday or Friday over the phone

Mr. Fridkis: ah. huh, ah

Mr. Brose: and he was down yesterday morning and we had a chat and decided he's like to represent The Tool Box in that area, he said that he's been working before for Jacron in Philadelphia

Mr. Fridkis: yeh, yeh, well this was what the story was on it and

Mr. Brose: what, did he get fired

Mr. Fridkis: ah, yeh, yeh, they were, ah, ah, noticing things, you know what I mean

Mr. Brose: Oh boy

Mr. Fridkis: ah, noticing things that, ah, ah, were, ah, some checks came in that were made out to him, you know what I mean

Mr. Brose: ah huh

Mr. Fridkis: you know, and ah, ah, they were noticing some stuff that was disappearing and he had about $3000 worth of merchandise on the truck and ah, when they turned the things in it just didn't jive

Mr. Brose: didn't jive, yeh

Mr. Fridkis: yeh

Mr. Brose: good heavens

Mr. Fridkis: yeh, and well you know, little things, ah, ah, that he had, you know how guys take stuff out of the place there and he doesn't turn a ticket in on it, you know what I mean

Mr. Brose: oh, oh

Mr. Fridkis: in other words, odd ball stuff, you know, hey he took out three tools there and, ah, that was three weeks ago and we don't have a ticket on it

Mr. Brose: oh, oh

Mr. Fridkis: you know, like what happened to the ticket

Mr. Brose: I think we have pretty good inventory control. I think, well, ah, we can't watch everything, you and I both know that but you just

Mr. Fridkis: yeh, well I just, you know, just tipped you off

Mr. Brose: I appreciate it

Mr. Fridkis: and kind of watch him very, very carefully so far as this is concerned

Mr. Brose: Thank you Buddy

Mr. Fridkis: you know, see whats what, he did a lot of business and this is not a drop for him. Now when he first went out there he was doing all kinds of business, then as the months went by his business started to get less and less

Mr. Brose: oh

Mr. Fridkis: got it, and ah, ah, well I ran out there a few times, ah, ah, I didn't bump heads with him or anything like that. I had a couple of customers I ran out there for but as far as I'm concerned, that's a real pain in the tail

Mr. Brose: oh yeh

Mr. Fridkis: well, as, you know

Mr. Brose: that far away

Mr. Fridkis: two or three hours ride, you know * * * * I tipped you off on this thing you know

Mr. Brose: yeh, well I sure appreciate your telling me and letting me know about that

Mr. Fridkis: Well I was curious to see when he started working for you. Had he been working for

you at the same time he was working for Jacron in Philadelphia.

Mr. Brose: Ah

Mr. Fridkis: got it, got it

Mr. Brose: Unless he's still on their payroll now, I understand that he was

Mr. Fridkis: No, no, he's not on the payroll, he was even fired last week I believe, got it

Mr. Brose: Oh, he told me he was not on their payroll and there was not a written contract or anything so he was open, he was available so

Mr. Fridkis: yeh, yeh

Mr. Brose: He seemed like a real nice guy, real nice fellow

Mr. Fridkis: Well just keep an eye on him that's all and ah, that's all I can say as far as that goes

Mr. Brose: Thanks Bob

Mr. Fridkis: I think I just met the guy personally a few times, I don't really know him. Well I was just talking to Jack and he asked me about it. He was working for you cause he had heard that he had told someone that he had been working for you three or four weeks, you know

Mr. Brose: No, if he had been working for anybody it wasn't The Tool Box

Mr. Fridkis: o.k., that's all

Mr. Brose: If he was, then he and Freddie had something going on the side. I didn't know him that long ago. In fact, it was Thursday or Friday that I talked to him the first time.

Mr. Fridkis: okey Bill

Mr. Brose: Thank you ole buddie, . . . ."

The conversation returned to other business matters and terminated shortly thereafter.

Brose asked Sindorf to come to the office. Brose told him

what Fridkis said. Within two months Sindorf filed the slander action.

*The Question for Decision*

The precise question for us to decide is whether the trial judge erred in granting the motion for a directed verdict made by Jacron at the close of all the evidence. The answer is reached through the determination of several interrelated questions.

" [I]njuries affecting a man's *reputation* or good name are, first by malicious, scandalous, and slanderous *words*, tending to his damage and derogation. As if a man maliciously and falsely utter any slander of false tale of another; which may either endanger him in law, by impeaching him of some heinous crime, as to say that a man hath poisoned another, or is perjured; or which may exclude him from society, as to charge him with having an infectious disease, or which may impair or hurt his trade or livelihood, as to call a tradesman a bankrupt, a physician a quack, or a lawyer a knave . . . . It is said, that formerly no actions were brought for words, unless the slander was such as (if true) would endanger the life of the object of it. But, too great encouragement being given by this lenity to false and malicious slanderers, it is now held that for scandalous words of the several species before mentioned . . . an action on the case may be had, without proving any particular damage to have happened, but merely upon the probability that it might happen. But with regard to words that do not thus apparently, and upon the face of them, import such defamation as will of course be injurious, it is necessary that the plaintiff should aver some particular damage to have happened; which is called laying his action with a *per quod*." 3 W. Blackstone, *Commentaries*, *123-124.

In the posture in which the case is presented, we are not concerned with the nature of the slanderous publication uttered by Fridkis and imputed to Jacron. Jacron does not dispute that the words were slanderous *per se*, that is, such words as "apparently and on the face of them, import such defamation as will of course be injurious." Jacron so

conceded, for the purpose of the motion, at the argument on the motion for a directed verdict made by it at the close of evidence offered by Sindorf. It maintained, however, that it had a conditional privilege to defame. Sindorf argued that in view of the concession, he did not have to show malice if a conditional privilege did not accrue to Jacron. He agreed in response to a direct question by the trial judge that he had shown no malice in the presentation of his case. The court denied the motion for a directed verdict and Jacron offered evidence, thereby withdrawing the motion previously made. Rule 522 b. At the close of all the evidence, Jacron renewed its motion for a directed verdict. It argued strenuously that in the circumstances it had a conditional privilege to defame Sindorf and that Sindorf had not overcome the presumption that the privileged words were spoken without malice. Sindorf maintained that there was no conditional privilege. He shifted his position from his previous concession that he had shown no malice, however. He asserted that malice could be inferred from the evidence, "even if there was a privilege." In granting the motion, the court found as a matter of law that there was a conditional privilege accruing to Jacron. It found further that Sindorf had adduced no evidence whatsoever to show malice subsequent to his concession that he had not proved the existence of malice, and that, in any event, the whole of the evidence was not sufficient to establish malice.

The first interrelated question to be resolved is whether Jacron enjoyed a conditional privilege to defame Sindorf.

### Privilege to Defame

"In an action for defamation, the plaintiff's prima facie case is made out when he has established a publication to a third person for which the defendant is responsible, the recipient's understanding of the defamatory meaning, and its actionable character. It is then open to the defendant to set up various defenses, which to some extent have moderated the rigors of the law of libel and slander." W. Prosser, *Law of Torts*, 776 (4th ed., 1971). One of these defenses is privilege. "It rests upon the . . . idea, that conduct

which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation. The interest thus favored may be one of the defendant himself, of a third person, or of the general public. If it is one of paramount importance, considerations of policy may require that the defendant's immunity for false statements be absolute, without regard to his purpose or motive, or the reasonableness of his conduct." *Id.* This is absolute privilege. *See Kerpelman v. Bricker,* 23 Md. App. 628. "If it has relatively less weight from a social point of view, the immunity may be qualified, and conditional upon good motives and reasonable behavior. The defendant's belief in the truth of what he says, the purpose for which he says it, and the manner of publication, all of which are immaterial when no question of privilege is involved, may determine the issue when he enters the defense of such a conditional privilege." Prosser, at 776-777. In the words of Baron Parke in *Toogood v. Spyring,* 1 C. M. & R. 181, 149 Eng. Rep. 1044 (1834), a publication is conditionally privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." A considerable segment of the common law rules with respect to qualified privileges has been taken over by decisions of the Supreme Court of the United States into a broad constitutional privilege under the First Amendment involving not only defamation but the right of privacy. The constitutional privilege concerns, generally speaking, defamation of public officials and public figures. *See A. S. Abell Co. v. Barnes,* 258 Md. 56, *cert. den.* 403 U. S. 921. Aside from constitutional privilege, which plays no part in the case before us, the types of interest which are protected by a qualified privilege are classified by Prosser, at 786, as interest of the publisher, interest of others, common interest of publisher and recipient, communications made to one who may act in the public interest, and fair comment on matters of public concern.

*See, Restatement,* Torts, §§ 593-598 (1938); F. Harper and F. James, *The Law of Torts,* §§ 5.25-5.26 (1956). "The condition attached to all such qualified privileges is that they must be exercised in a reasonable manner and for a proper purpose. The immunity is forfeited if the defendant steps outside of the scope of the privilege, or abuses the occasion . . . . [It does not] include publication to any person other than those whose hearing of it is reasonably believed to be necessary or useful for the furtherance of that interest. . . . Any reasonable and appropriate method of publication may be adopted which fits the purpose of protecting the particular interest. The dictation of a business letter to a stenographer . . . may be privileged on proper occasion. . . . [T]he fact that the communication is incidentally read or overheard by a person to whom there is no privilege to publish it will not result in liability, if the method adopted is a reasonable and appropriate one under the circumstances." Prosser, at 792-794.

The burden is upon the defendant in the first instance to establish the existence of a privileged occasion for the publication, by proof of a proper interest or duty justifying the utterance of the words. "Whether the occasion was a privileged one, is a question to be determined by the court as an issue of law, unless of course the facts are in dispute, in which case the jury will be instructed as to the proper rules to apply." *Id.,* at 796.

The rules of law as to conditional privilege followed in Maryland generally reflect the views of the authorities above discussed. *See, e.g. Orrison v. Vance,* 262 Md. 285; *Simon v. Robinson,* 221 Md. 200. Thus, the law of this State is that a defamatory publication is conditionally privileged when the occasion shows that the communicating party and the recipient have a mutual interest in the subject matter, or some duty with respect thereto. *Hanrahan v. Kelly,* 269 Md. 21, 28, quoting *Simon v. Robinson, supra,* at 206. Over seventy-five years ago the Court of Appeals established that where an employer gives a character of an employee the communication is conditionally privileged under the

principle that the party communicating has a duty owed, even though such duty is not a legal one, but only a moral or social duty of imperfect obligation. This is so even though the defamatory information was given voluntarily rather than upon request. *Fresh v. Cutter*, 73 Md. 87, 92-94.[6] In *Hanrahan v. Kelly, supra,* at 28, n. 2, the Court stated that it had previously recognized that qualified privilege arising by reason of common interest in the subject matter can inhere in business dealings between the publisher and the recipient, referring to *Deckelman v. Lake,* 149 Md. 533 and *Bavington v. Robinson,* 124 Md. 85. The authorities are in general agreement that where a former employer communicates with a new or prospective employer about a former employee, a conditional privilege arises from a discharge of duty owed to the new or prospective employer. Prosser, at 787-788; *Restatement* Torts § 595 (1938), Comment h at 252-253; Harper, *Privileged Defamation,* 22 Va. L. Rev. 642-651 (1936); Jones, *Interest and Duty in Relation to Qualified Privilege,* 22 Mich. L. Rev. 437, 444 (1924). Odgers on Slander & Libel, cited with approval in *Fresh,* takes the broader view that the duty is owed to society.

Sindorf argues that because he was never employed by the Virginia Jacron, the privilege recognized in *Fresh* did not arise. We do not read *Fresh* and the authorities so narrowly as to confine the duty as owed only by a former employer. The basis for the privilege depends upon the particular circumstances of the communication. Other persons may have a *bona fide* belief that they owe a moral or social duty

---

6. The facts in *Fresh* are similar to those in the instant case. "Cutter had at one time been an employee of Fresh, but after he ceased to occupy that relation and had entered, or was about to enter, the service of one Allen, Fresh, of his own accord and without solicitation or inquiry on the part of Allen, said to Allen 'he (meaning the plaintiff) stole as good as $200 from me and I want the money.' " At 91. The Court held, at 94:

> "It follows from these principles that if the communication made to Allen was made in good faith, without malice, in the honest belief of its truth, and under the conviction that it was a duty which Fresh owed to Allen to make it; the words complained of would not be actionable, because privileged, though spoken voluntarily. It is equally clear that if the words spoken were known to be false and were maliciously spoken; or were voluntarily spoken to one to whom Fresh owed no duty in the sense heretofore mentioned, the words would be actionable, because not within the privilege."

to inform a new or prospective employer about an employee. This is not to say that anyone is privileged to communicate adverse information to an employer. In many instances a reasonable man would conclude that to communicate with an employer would be "officious intermeddling", Prosser, at 788, and therefore the communication would not be privileged. The circumstances here, however, were that the defamer was the vice-president of the subsidiary of the corporation which was Sindorf's former employer, and that the communicator and recipient, even though competitors, had a close personal and business relationship. Whether based on a duty owed or a common interest, we think that a qualified privilege arose. In the absence of a dispute as to the facts, the existence *vel non* of a common interest or duty giving rise to a qualified privilege is a matter of law for the court. *Simon v. Robinson, supra,* at 205; *Fresh v. Cutter, supra,* at 94. There was no dispute here as to such facts. We conclude that the trial court did not err in holding as a matter of law that Fridkis, and therefore Jacron, had a conditional privilege to communicate the defamatory utterance to Brose.

The second interrelated question is whether Jacron lost the privilege to defame.

### Loss of a Conditional Privilege to Defame

Because a conditional or qualified privilege is conditioned upon publication in a reasonable manner and for a proper purpose, it is defeasible. "A finding of conditional privilege conditionally negates the presumption of malice and shifts the burden to the plaintiff to show actual malice." *Hanrahan v. Kelly, supra,* at 29, citing *Peurifoy v. Congressional Motors, Inc.,* 254 Md. 501. The Court of Appeals said in *Orrison v. Vance, supra,* at 295:

> "[M]alice means a reckless disregard of truth, the use of unnecessarily abusive language, or other circumstances which would support a conclusion that the defendant acted in an ill-tempered manner or was motivated by ill-will. *Stevenson [v. Baltimore Club,* 250 Md. 482] at 487. In determining

an abuse of privilege all relevant circumstances are admissible, *Foley v. Hoffman*, 188 Md. 273 (1947), including the defendant's reasonable belief in the truth of his statements, *Simon* [*v. Robinson*], *supra*, the excessive nature of the language used, *Stevenson*, *supra*, *Fresh*, *supra*, whether the disclosures were unsolicited, *id.*, and whether the communication was made in a proper manner and only to proper parties, *Kennedy v. Cannon*, 229 Md. 92 (1962)." [7]

"Malice may be a jury question." *Hanrahan v. Kelly*, *supra*, at 29. It is a jury question unless only one conclusion can be drawn from the evidence. Prosser, at 796. In other words, it is only when the evidence and all inferences fairly deducible therefrom lead to conclusions from which reasonable minds could not differ, that the issue of malice is one of law for the court and not one of fact for the jury. The Court said in *Fresh v. Cutter*, *supra*, at 93-94, after observing that it is a question for the court whether the publication was privileged:

"But the plaintiff has the right notwithstanding the privileged character of the communication to go to the jury, if there be evidence tending to show actual malice, as when the words unreasonably impute crime, or the occasion of their utterance is such as to indicate, by its unnecessary publicity or otherwise, a purpose wrongfully to defame the plaintiff. ... Or, malice may be established by showing that the publication contained matter not relevant to the occasion. ... Expressions in excess of what the occasion warrants do not *per se* take

---

7. Prosser said that the qualified privilege will be lost if the defendant publishes the defamation "in the wrong state of mind." At 794. He thought that the statement that the privilege is defeated if the publication is "malicious" is misleading and discounted malice in this context as a "meaningless and quite unsatisfactory term." At 795. He concluded, at 796: "Probably the best statement of the rule is that the defendant is required to act as a reasonable man under the circumstances, with due regard to the strength of his belief, the grounds that he has to support it, and the importance of conveying the information."

away the privilege, but such excess may be evidence of malice . . . ."

In the posture this case comes to us, whether "there be evidence tending to show actual malice" must be considered in the frame of reference of the prevailing rule of law with respect to directed verdicts — where the court directs in favor of one of the parties, we must assume the truth of all credible evidence in the case tending to sustain the contention of the party against whom the verdict is directed as well as all inferences of fact reasonably and fairly deducible therefrom. *Trionfo v. R. J. Hellman, Inc.*, 250 Md. 12, 15; *Buchanan v. Galliher.* 11 Md. App. 83, 87-88. The motion for a directed verdict was primarily based on the theory that there was no sufficient showing by Sindorf of malice within the meaning of that word as defeating a conditional privilege. It appears that the grant of the motion was substantially bottomed on that reason. We think that the grant of the motion was wrong. We believe that the evidence, when viewed as required by the rule pertaining to the grant *vel non* of a directed verdict, led to conclusions from which reasonable minds could differ. We start with the rule that the publisher's motive will be more carefully scrutinized if his statements are volunteered than if they are in response to an inquiry, in which latter instance, greater latitude is permitted. We observe that Fridkis clearly indicated that Sindorf had been fired, whereas, as far as the record shows, he resigned. It does not appear that Langton told Fridkis that Sindorf was fired, and if Fridkis did not in fact know that Sindorf was not fired, stating that he was fired could be found to be a reckless disregard of truth. Langton, before asking Fridkis to call Brose, told Fridkis that Sindorf claimed he would return the "inventory" Sindorf retained when he received his commission money. This is borne out by a letter, referred to as Sindorf's letter of resignation, sent to Jacron of Pennsylvania under date of 23 July 1973. In that letter, Sindorf enclosed invoices representing material in his possession "which I accept as partial payment of the commissions due me as of July 23, 1973." He added, "At such time as the monies due me are

paid, all material will be gladly returned to Jacron Sales Co." None of this was communicated by Fridkis to Brose. According to Langton, Fridkis was to call Brose to verify that Sindorf was working for Tool Box and to ascertain whether he had been working for Tool Box and Jacron at the same time. Fridkis patently went far beyond this in his conversation with Brose. When Fridkis was unable to reach Brose on his first attempt, he spoke to the secretary. What he said to her led her to believe that Sindorf was a thief. The trial judge could not understand how she reached this conclusion, but we cannot say that a reasonable person would be unable to conclude from what Fridkis told her that Sindorf was a thief.[8] We observe that the publisher will be liable if he publishes his statement to accomplish a distinct objective, which may be legitimate enough in itself but is not within the privilege. Prosser, at 795. We think that a reasonable person could conclude from the evidence that Fridkis's communication to Brose was an effort to pressure Sindorf into returning the material he was holding or, perhaps, simply to ascertain, as Langton requested, the date of employment of Sindorf by Tool Box. Neither would be within the privilege. The short of it is that we cannot find, assuming the truth of all credible evidence on the issue of malice and of all inferences fairly deducible therefrom, and considering them in the light most favorable to Sindorf, that they lead to the conclusions, from which reasonable minds could not differ, that Fridkis, and through him, Jacron, did not abuse the privilege to defame by excessive publication or by use of the occasion for an improper purpose, or by lack of grounds for belief in the truth of what was said. Therefore, the question of malice was properly for the jury and the trial judge erred in granting the motion for a directed verdict. The issue of malice should have gone to the jury with appropriate instructions. We reverse the judgment and remand the case for a new trial.

---

8. For a discussion of publication to secretaries see *Hanrahan v. Kelly, supra,* at 32-37.

*Defamation and the First Amendment*

As this case was first briefed and argued before us, no reference was made to recent decisions of the Supreme Court of the United States concerning defamation and the First Amendment guarantee of freedom of speech and press.[9] Because we were concerned with the impact of those decisions on the law of defamation followed in Maryland, we ordered the case to be reargued in the light of those decisions.

As is manifest, the defamation here was purely private. That is, the parties involved were private persons, neither public officials nor public figures, and the defamatory statement was private, neither a matter of public interest nor general concern. We are satisfied that, with respect to such purely private defamation, the Supreme Court decisions leave the Maryland law of defamation untouched. We give our reasons.

The decision which prompted our concern was *Gertz v. Welch, Inc.*, 418 U. S. 323, decided 25 June 1974. About ten years ago the Supreme Court decided *New York Times Co. v. Sullivan*, 376 U. S. 254. In that case the Court "defined a constitutional privilege intended to free criticism of public officials from the restraints imposed by the common law of

---

**9.** "Congress shall make no law . . . abridging the freedom of speech, or of the press. . . ." Amendment I, Constitution of the United States.

It was observed in A. S. Abell Co. v. Barnes, 258 Md. 56, footnote 1 at 59:

"Of course it had long been firmly established that the freedoms secured by the first amendment to the Constitution of the United States against abridgment by the United States are similarly secured to all persons by the fourteenth amendment against abridgment by a state. See *Stromberg v. State of California*, 283 U. S. 359, 368-369 (1931). But defamation had generally been considered to be outside the scope of the first amendment. See, for example, *Beauharnais v. State of Illinois*, 343 U. S. 250 (1952). This appeared to be accepted even by advocates of the 'absolutist' interpretation of the amendment. See Meiklejohn, *The First Amendment is an Absolute*, 1961 Sup. Ct. Rev. 245, 258. However, the question of measuring the common law of defamation by constitutional standards had arisen in connection with the absolute privilege of high-ranking government officials. See *Barr v. Matteo*, 360 U. S. 564 (1959); *Spalding v. Vilas*, 161 U. S. 483 (1896). And in *Schenectady Union Pub. Co. v. Sweeney*, 316 U. S. 642 (1942) the Court was evenly divided on a question of libel to a public official."

defamation." *Gertz*, at 334. In *Rosenblatt v. Baer*, 383 U. S. 75 (1966) the Court suggested the minimal perimeters of the "public official" classification, including therein all persons "among the hierarchy of government employees who have, or appear to have, substantial responsibility or control over the conduct of government affairs." 383 U. S. at 85.[10] In 1967 in *Curtis Publishing Co. v. Butts* and its companion *Associated Press v. Walker*, 388 U. S. 130, a majority of the Court extended the constitutional privilege to defamatory criticism of "public figures". Thereafter, the Court engaged or acquiesced "in a progressive expansion of the public figure category into decreasingly public spheres." [11] See *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U. S. 6 (1970). The process seemed to end with *Rosenbloom v. Metromedia, Inc.*, 403 U. S. 29 (1971), in which a plurality opinion [12] took the *New York Times* privilege one step further, concluding that "its protection should extend to defamatory falsehoods relating to private persons if the statements concerned matters of general or public interest." *Gertz*, 418 U. S. at 337. The plurality abjured the suggested distinction between public officials and public figures on the

---

10. In a series of decisions the Court included in the "public official" classification, judges, Garrison v. Louisiana, 379 U. S. 64 (1964); a police chief, Henry v. Collins, 380 U. S. 356 (1965); a recreation supervisor, Rosenblatt v. Baer, 383 U. S. 75 (1966); a county clerk, Beckley Newspapers Corp. v. Hanks, 389 U. S. 81 (1967); a deputy sheriff, St. Amant v. Thompson, 390 U. S. 727 (1968); and candidates for public office, Monitor Patriot Co. v. Roy, 401 U. S. 265 (1971) and Ocala Star-Banner Co. v. Damron, 401 U. S. 295 (1971).

11. Frakt, *The Evolving Law of Defamation*: New York Times Co. v. Sullivan *to* Gertz v. Robert Welch, Inc. *and Beyond*, 6 Rutgers — Camden L. J. 471, 475-476 (1975). Frakt notes that the expansion is amply documented in Note, *Public Official and Actual Malice Standards: The Evolution of* New York Times v. Sullivan, 56 Iowa L. Rev. 393, 395-398 (1970).

12. No majority could agree on a controlling rationale. Chief Justice Burger and Justice Blackmun joined the plurality opinion delivered by Justice Brennan. 403 U. S. at 30. Justice Black concurred in the judgment, reasserting his absolutist view of the first amendment. *Id.* at 57. Justice White concurred in the result, but would narrow the holding to private individuals connected with official acts of public servants. *Id.* at 62. Justices Harlan, Marshall, and Stewart dissented in two separate opinions. *Id.* at 62, 78. Justice Douglas took no part in the decision. *Id.* at 57. Although only three justices supported the adoption of the *New York Times* rule, all eight approved of some form of constitutional protection concerning matters of public interest.

one hand and private individuals on the other, focusing on society's interest in learning about certain issues: "If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved." *Rosenbloom*, 403 U. S. at 43.[13]

*New York Times* announced the test for the application of the constitutional privilege, 376 U. S. at 279-280:

> "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

It held that the newspaper's failure to check the information published did not establish a reckless disregard for the truth under the circumstances. The standard enunciated was explicated in subsequent opinions, and its meaning narrowed, obviously prompted by concern with the chilling effect on first amendment freedoms posed by state libel laws for the benefit of public officials and public figures. *Garrison v. Louisiana, supra,* emphasized the necessity for a showing that a false publication was made with "a high degree of awareness of . . . probable falsity." 379 U. S. at 74.

---

13. The plurality holding in *Rosenbloom* was set out at 403 U. S. at 52:
> "We thus hold that a libel action, as here, by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not."

The plurality noted, *id.*, footnote 18, that "ill will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard. That standard requires only that the plaintiff prove knowing or reckless falsity. That burden, and no more, is the plaintiff's whether 'public official', 'public figure', or 'little man'." At oral argument the petitioner argued that "the little man can't show actual malice. How can George Rosenbloom show that there was actual malice in Metromedia? They never heard of him before."

76

In *Henry v. Collins, supra,* the Court concluded that an intent to inflict harm — the measure of malice of the common law — was not necessary. 380 U. S. at 357. The opinion of Harlan, J., in *Curtis Publishing Co. v. Butts, supra,* stated that evidence of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" was essential to recovery by public officials in defamation actions. 388 U. S. at 153. Finally the Court said in *St. Amant v. Thompson, supra:*

> "These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." 390 U. S. at 731.[14]

There appears to be general accord among the commentators [15] that by the advent of *Rosenbloom* the

---

**14.** The Court was aware that the test left much to be desired but made clear that it embraced it, 390 U. S. at 731-732:
> "It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. We adhere to this view and to the line which our cases have drawn between false communications which are protected and those which are not."

**15.** In addition to the article by Frakt, note 11, *supra,* see 41 Brooklyn L. Rev. 389 (1974); Comment, *Reply and Retraction in Actions Against the*

"actual malice" test had become far more strict and the constitutional privilege had extended far beyond the justification of the rationales set out by *New York Times* when it abandoned the premise that the law of libel remained wholly outside the First Amendment's aegis. The opinion of the Court in *Gertz* observes: "Thus, under the plurality opinion [in *Rosenbloom*], a private citizen involuntarily associated with a matter of general interest has no recourse for injury to his reputation unless he can satisfy the demanding requirements of the *New York Times* test." 418 U. S. at 337. The privilege had become virtually impossible to overcome because of the difficulty in meeting the "actual malice" test by demonstrating by clear and convincing evidence what a publisher actually knew, regardless of what he should have known had he been reasonable in his methods of gathering information.

The status of the law prior to *Rosenbloom* was summed up in *A. S. Abell Co. v. Barnes, supra,* at 59-60:

> "One of the things the prolific *New York Times* and its progeny did was to measure state law, both civil and criminal, with respect to libel, slander and privacy, by constitutional standards, impressing on it the first amendment guarantees of free speech and press. They did so in such a way as to grant immunity from punishment by way of damages, imprisonment, fine or otherwise to publishers of statements concerning the official conduct of public officials and concerning matters of public interest related to public figures. The immunity is by privilege to the published statements. The privilege extends to true statements and false statements. With respect to true statements the privilege is absolute; with respect to false statements it is conditional. The privilege is removed only from

*Press for Defamation: The Effect of* Tornillo *and* Gertz, 43 Fordham L. Rev. 223 (1974); Supreme Court Review, 1973 Term, 88 Harv. L. R. 139 (1974); Brosnahan, *From* Times v. Sullivan *to* Gertz v. Welch: *Ten Years of Balancing Libel Law and the First Amendment,* 26 Hastings L. J. 777 (1975).

those false statements which are made with 'actual malice'."

*Rosenbloom* left the law of defamation in a speculative position, and was criticized as fraught with apparent dangers to defamed individuals.[16] It was inevitable, therefore, that the interests in favor of First Amendment protection, on the one hand, and the need for redress of injury to the individual, on the other hand, would lead to a reconsideration of the *Rosenbloom* plurality position. *Gertz* provided the Court with the opportunity to look again, under a rather different set of facts, at the question it had before it in *Rosenbloom,* as to which it had been unable to marshall the agreement of a majority. The question in *Rosenbloom* and the principal issue in *Gertz* was "whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege against liability for the injury inflicted by those statements." *Gertz*, at 332.

The path of *Gertz* through the lower courts is clearly traced by the opinion of the Court, 418 U. S. at 325-332:

"In 1968 a Chicago policeman named Nuccio shot and killed a youth named Nelson. The state authorities prosecuted Nuccio for the homicide and ultimately obtained a conviction for murder in the second degree. The Nelson family retained petitioner Elmer Gertz, a reputable attorney to represent them in civil litigation against Nuccio.

[Robert Welch, Inc.] publishes American Opinion, a monthly outlet for the views of the John Birch Society. Early in the 1960's the magazine began to warn of a nationwide conspiracy to discredit local law enforcement agencies and create

---

**16.** See Frakt, *supra,* at 477-480. It was suggested in 41 Brooklyn L. Rev. at 397 that *Rosenbloom* "left little, if any, room for vindication of reputation if the very reporting of an event by the media were to create a conclusive presumption of public or general interest. Newsworthiness, then, would define the scope of first amendment protection, and would insulate all incidental attacks on private individuals, affording them little opportunity for redress."

in their stead a national police force capable of supporting a Communist dictatorship. As part of the continuing effort to alert the public to this assumed danger, the managing editor of American Opinion commissioned an article on the murder trial of Officer Nuccio. For this purpose he engaged a regular contributor to the magazine. In March 1969 [Welch] published the resulting article under the title 'FRAME-UP: Richard Nuccio And The War On Police.' The article purports to demonstrate that the testimony against Nuccio at his criminal trial was false and that his prosecution was part of the Communist campaign against the police.

In his capacity as counsel for the Nelson family in the civil litigation [Gertz] attended the coroner's inquest into the boy's death and initiated actions for damages, but he neither discussed Officer Nuccio with the press nor played any part in the criminal proceeding. Notwithstanding [Gertz's] remote connection with the prosecution of Nuccio, [Welch's] magazine portrayed him as an architect of the 'frame-up.' According to the article, the police file on [Gertz] took 'a big, Irish cop to lift.' The article stated that [Gertz] had been an official of the 'Marxist League for Industrial Democracy, originally known as the Intercollegiate Socialist Society, which has advocated the violent seizure of our government.' It labeled Gertz a 'Leninist' and a 'Communist-fronter.' It also stated that Gertz had been an officer of the National Lawyers Guild, described as a Communist organization that 'probably did more than any other outfit to plan the Communist attack on the Chicago police during the 1968 Democratic Convention.'

These statements contained serious inaccuracies. The implication that [Gertz] had a criminal record was false. [Gertz] had been a member and officer of the National Lawyers Guild some 15 years earlier, but there was no evidence that he or that

organization had taken any part in planning the 1968 demonstrations in Chicago. There was also no basis for the charge that [Gertz] was a 'Leninist' or a 'Communist-fronter.' And he had never been a member of the 'Marxist League for Industrial Democracy' or the 'Intercollegiate Socialist Society.'

The managing editor of American Opinion made no effort to verify or substantiate the charges against [Gertz]. Instead, he appended an editorial introduction stating that the author had 'conducted extensive research into the Richard Nuccio Case.' And he included in the article a photograph of [Gertz] and wrote the caption that appeared under it: 'Elmer Gertz of Red Guild harrasses Nuccio.' [Welch] placed the issue of American Opinion containing the article on sale at newsstands throughout the country and distributed reprints of the article on the streets of Chicago.

[Gertz] filed a diversity action for libel in the United States District Court for the Northern District of Illinois. He claimed that the falsehoods published by [Welch] injured his reputation as a lawyer and citizen. Before filing an answer, [Welch] moved to dismiss the complaint for failure to state a claim upon which relief could be granted, apparently on the ground that [Gertz] failed to allege special damages. But the court ruled that statements contained in the article constituted libel *per se* under Illinois law and that consequently [Gertz] need not plead special damages. 306 F. Supp. 310 (1969).

After answering the complaint, [Welch] filed a pretrial motion for summary judgment, claiming a constitutional privilege against liability for defamation. It asserted that [Gertz] was a public official or a public figure and that the article concerned an issue of public interest and concern. For these reasons, [Welch] argued, it was entitled to invoke the privilege enunciated in *New York*

*Times Co. v. Sullivan*, 376 U. S. 254 (1964). Under this rule [Welch] would escape liability unless [Gertz] could prove publication of defamatory falsehood 'with "actual malice" — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' *Id.*, at 280. [Welch] claimed that [Gertz] could not make such a showing and submitted a supporting affidavit by the magazine's managing editor. The editor denied any knowledge of the falsity of the statements concerning [Gertz] and stated that he had relied on the author's reputation and on his prior experience with the accuracy and authenticity of the author's contributions to American Opinion.

The District Court denied [Welch's] motion for summary judgment in a memorandum opinion of September 16, 1970. The court did not dispute [Welch's] claim to the protection of the *New York Times* standard. Rather, it concluded that [Gertz] might overcome the constitutional privilege by making a factual showing sufficient to prove publication of defamatory falsehood in reckless disregard of the truth. During the course of the trial, however, it became clear that the trial court had not accepted all of [Welch's] asserted grounds for applying the *New York Times* rule to this case. It thought that [Welch's] claim to the protection of the constitutional privilege depended on the contention that [Gertz] was either a public official under the *New York Times* decision or a public figure under *Curtis Publishing Co. v. Butts*, 388 U. S. 130 (1967), apparently discounting the argument that a privilege would arise from the presence of a public issue. After all the evidence had been presented but before submission of the case to the jury, the court ruled in effect that [Gertz] was neither a public official nor a public figure. It added that, if he were, the resulting application of the *New York Times* standard would require a directed

verdict for [Welch]. Because some statements in the article constituted libel *per se* under Illinois law, the court submitted the case to the jury under instructions that withdrew from its consideration all issues save the measure of damages. The jury awarded $50,000 to [Gertz].

Following the jury verdict and on further reflection, the District Court concluded that the *New York Times* standard should govern this case even though [Gertz] was not a public official or public figure. It accepted [Welch's] contention that that privilege protected discussion of any public issue without regard to the status of a person defamed therein. Accordingly, the court entered judgment for [Welch] notwithstanding the jury's verdict. This conclusion anticipated the reasoning of a plurality of this Court in *Rosenbloom v. Metromedia, Inc.*, 403 U. S. 29 (1971).

[Gertz] appealed to contest the applicability of the *New York Times* standard to this case. Although the Court of Appeals for the Seventh Circuit doubted the correctness of the District Court's determination that [Gertz] was not a public figure, it did not overturn that finding. It agreed with the District Court that [Welch] could assert the constitutional privilege because the article concerned a matter of public interest, citing this Court's intervening decision in *Rosenbloom v. Metromedia, Inc., supra.* The Court of Appeals read *Rosenbloom* to require application of the *New York Times* standard to any publication or broadcast about an issue of significant public interest, without regard to the position, fame, or anonymity of the person defamed, and it concluded that [Welch's] statements concerned such an issue. After reviewing the record, the Court of Appeals endorsed the District Court's conclusion that [Gertz] had failed to show by clear and convincing evidence that [Welch] had acted with 'actual

malice' as defined by *New York Times*. There was
no evidence that the managing editor of American
Opinion knew of the falsity of the accusations made
in the article. In fact, he knew nothing about
[Gertz] except what he learned from the article.
The court correctly noted that mere proof of failure
to investigate, without more, cannot establish
reckless disregard for the truth. Rather, the
publisher must act with a ' "high degree of
awareness of . . . probable falsity." ' *St. Amant v.
Thompson*, 390 U. S. 727, 731 (1968); accord,
*Beckley Newspapers Corp. v. Hanks*, 389 U. S. 81,
84-85 (1967); *Garrison v. Louisiana*, 379 U. S. 64,
75-76 (1964). The evidence in this case did not reveal
that [Welch] had cause for such an awareness. The
Court of Appeals therefore affirmed 471 F. 2d 801
(1972)." (Footnotes omitted).

The Supreme Court reversed by a bare majority reluctantly
obtained.[17]

*Gertz* reaffirmed the application of the *New York Times*
test to public officials and public figures:

---

17. Powell, J. delivered the opinion of the Court, in which Stewart,
Marshall, Blackmun, and Rehnquist, JJ., joined. Blackmun, J., filed a
concurring opinion, admitting that were his vote not needed for a majority,
he would adhere to the views expressed by the *Rosenbloom* plurality, in
which he had joined. He said, 418 U. S. at 354: "I feel that it is of profound
importance for the Court to come to rest in the defamation area and to have
a clearly defined majority position that eliminates the unsureness
engendered by *Rosenbloom's* diversity."

The four dissenters were far apart. The Chief Justice preferred not to
alter the "orderly development" of the law in this area. He would reinstate
the jury verdict, however, because he felt that "the public policy which
underlies [the right to counsel] would be gravely jeopardized if every
lawyer who takes an 'unpopular' case, civil or criminal, would
automatically become fair game for irresponsible reporters and editors who
might, for example, describe the lawyer as a 'mob mouthpiece' for
representing a client with a serious criminal record, or as an 'ambulance
chaser' for representing a claimant in a personal injury action." *Id.*, at 355
(Burger, C. J., dissenting). Douglas, J., reiterated his absolutist views of the
first and fourteenth amendments. *Id.*, at 355-360 (Douglas, J., dissenting).
Brennan, J., adhered to his plurality opinion in *Rosenbloom*. *Id.*, at 361-369
(Brennan, J., dissenting). White, J., viewed the opinion of the Court as "an
ill-considered exercise of the power entrusted to this Court . . ." with a
detrimental impact on the traditional law of libel. *Id.*, at 370-371. (White,
J., dissenting). Mr. Justice White's dissenting opinion is discussed *infra*.

"The *New York Times* standard defines the level of constitutional protection appropriate to the context of defamation of a public person. Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." 418 U. S. at 342.

In declining to follow Welch's characterization of Gertz as a public official or as a public figure, the Court explicated the meaning of those terms. It stated that the cases recognize no such concept as that of a "de facto public official." Such concept "would sweep all lawyers under the *New York Times* rule as officers of the court and distort the plain meaning of the 'public official' category beyond all recognition." 418 U. S. at 351. It observed that the public figure designation may rest on either of two alternative bases. "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." *Id.* The opinion of the Court thus declared, at 352:

"It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation."

The Court found it plain in that context that Gertz was not a public figure. There appeared to be no disagreement about

this on the part of any member of the Court. Nor was there dispute on the Court that the defamatory charge concerned a matter of public or general interest. See 418 U. S. at 330, footnote 4 at 331 and 352.

The remainder of the opinion of the Court contains two basic holdings. The first is that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U. S. at 347. Because the legitimate state interest in protecting the good name of a private individual outweighs to some extent First Amendment values, the Court concluded "that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." *Id.*, at 345-346. In this area the majority of the Court repudiated the plurality opinion of *Rosenbloom*. "The extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree that we find unacceptable ... [The Constitution does not] require us to draw so thin a line between the drastic alternatives of the *New York Times* privilege and the common law of strict liability for defamatory error." *Id.* at 346.

The second basic holding is that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth. ... In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by *New York Times* may recover only such damages as are sufficient to compensate him for actual injury." *Id.* at 349 and 350.

We believe that these two holdings — (1) short of strict liability, the *New York Times* standard is not constitutionally required with respect to defamatory falsehood injurious to a private individual, and (2) punitive or presumed damages may be recovered only upon a showing of "actual malice" in the constitutional sense —

apply only when the defamatory statement concerns a matter of public or general interest. Common to all the cases, starting with *New York Times* and including *Gertz*, was a defamatory falsehood in the report of an event of public or general interest. See *Rosenbloom* at 30-31. Purely private defamations were not contemplated by the decision. The plurality in *Rosenbloom* pointed out, footnote 12 at 44:

> "We are not to be understood as implying that no area of a person's activities falls outside the area of public or general interest. We expressly leave open the question of what constitutional standard of proof, if any, controls the enforcement of state libel laws for defamatory falsehoods published or broadcast by news media about a person's activities not within the area of public or general interest.
>
> We also intimate no view on the extent of constitutional protection, if any, for purely commercial communications made in the course of business."

It is manifest that "the core value of the Free Speech Clause of the First Amendment" is the "public interest in having free and unhindered debate on matters of public importance." *Pickering v. Board of Education*, 391 U. S. 563, 573. It was to protect this "core value" that *New York Times* placed defamation within the ambit of the First Amendment. It found that none of the cases to the effect that the constitution does protect libelous publications [18] sustained the use of libel laws to impose sanctions upon expression critical of the official conduct of public officials. 376 U. S. at 268. *Garrison v. Louisiana*, 379 U. S. 64, made plain that "where the criticism is of public officials and their conduct of public business, the interest in private defamation is overborne by the larger public interest secured by the Constitution, *in the dissemination of truth.*" At 72-73 (emphasis added). The Court in *Rosenblatt v. Baer*,

---

**18.** See *New York Times*, 376 U. S. at 268, note 6, for a list of these cases. Several are discussed in detail in the dissent of White, J. in *Gertz*, 418 U. S. at 384-386.

383 U. S. 75, 85, left no doubt that the major focus of the constitutional privilege is the status of the defamed person and the subject matter of the defamation:

> "The motivating force for the decision in *New York Times* was twofold. We expressed 'a profound national commitment to the principle that debate on public issue should be uninhibited, robust, and wide-open, *and* that [such debate] may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' 376 U.S., at 270, 84 S.Ct., at 721. (Emphasis supplied.) There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues. Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized."

As we have indicated, as late as *Rosenbloom* the Court expressly left open the question of constitutional privilege as to purely private defamation, although, as we have pointed out, the rationale behind all the opinions applying the privilege was that the defamation related to a matter of general or public interest. As we have seen, *Gertz* also involved a matter of public interest. It augments our view that its holdings do not apply to purely private defamation. The majority quote Mr. Justice Stewart's reminder in his concurring opinion in *Rosenblatt*, 383 U. S. at 92, that the individual's right to the protection of his own good name

> "reflects no more than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean

that the right is entitled to any less recognition by
this Court as a basic of our constitutional system."

The Court would not lightly require the State to abandon its legitimate interest in the compensation of individuals for the harm inflicted on them by defamatory falsehood.

The "tension" necessarily existing "between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful inquiry", 418 U. S. at 342, does not arise in a purely private defamation. Thus, the first basic holding is explained as an "approach [which] provides a more equitable boundary between the competing concerns involved here," id. at 347-348, that is, the freedoms guaranteed by the First Amendment versus the sanctity of the individual's reputation. The second basic holding is explained in this manner: "The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms." At 349. It explains, id.: "We would not, of course, invalidate state law simply because we doubt its wisdom, but here we are attempting to reconcile state law with a competing interest grounded in the constitutional command of the First Amendment. It is therefore appropriate to require that state remedies for defamatory falsehood reach no further than is necessary to protect the legitimate interest involved." It is patent that the free speech interest is involved only when there is a matter of general or public interest. The majority iterate that "there is no constitutional value in false statements of fact." Id. at 340, quoting Chaplinsky v. New Hampshire, 315 U. S. 568, 572. Therefore, the constitutional privilege was not created to protect defamatory falsehoods, but "to avoid self-censorship by the news media." 418 U. S. at 341. The rationale of the privilege was explained at 340-341:

"Although the erroneous statement of fact is not
worthy of constitutional protection, it is
nevertheless inevitable in free debate. As James
Madison pointed out in the Report on the Virginia

Resolutions of 1798, 'Some degree of abuse is inseparable from the proper use of everything; and in no instance is this more true than that of the press.' 4 J. Elliot, Debates on the Federal Constitution of 1787, p. 571 (1876). *And punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press.* Our decisions recognize that a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to *intolerable self-censorship.* Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties. As the Court stated in *New York Times Co. v. Sullivan, supra,* at 279, 'Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred.' The First Amendment requires that we protect some falsehood in order to protect *speech that matters.* " (emphasis added)

As every decision on the subject from *New York Times* to *Gertz* shows, the "speech that matters" is that relating to issues of general or public interest. Purely private defamation of private individuals remains where it was before the constitutional privilege was created in *New York Times,* outside the ambit of the First Amendment. Self-censorship with regard to matters of purely private interest would in no way stifle the uninhibited, robust and wide-open debate on public issues. Such private defamation is not such an issue "about which information is needed or appropriate to enable members of society to cope with the exigencies of their period." *Rosenbloom,* 403 U. S. at 41. As Mr. Justice Goldberg said in his concurring opinion in *New York Times,* 376 U. S. at 301-302:

"Purely private defamation has little to do with the political ends of a self-governing society. The

imposition of liability for private defamation does not abridge the freedom of public speech or any other freedom protected by the First Amendment."

The short of it is that reading *Gertz* in the light of its rationale and the previous decisions of the Supreme Court, we conclude that its holdings apply only when a private individual is defamed as to a matter of general or public interest. Its holdings do not apply to private individuals whose reputation is tarnished by a private matter not of general or public concern, that is a purely private defamation,[19] regardless of the status of the defamer, be it the press or some other part of the news media. In such case no First Amendment values are at stake, the application of the constitutional privilege is unnecessary and unwarranted, and the states are free to define the limits of recovery.

*Cantrell v. Forest City Publishing Co.*, 95 S. Ct. 465, decided 18 December 1974, does not undermine our view. The Court pointed out, at 469: "[T]his case presents no occasion to consider whether a State may constitutionally apply a more relaxed standard of liability for a publisher or broadcaster of false statements injurious to a private individual under a false-light theory of invasion of privacy, or whether the constitutional standard announced in Time, Inc. v. Hill applies to all false-light cases. Cf. Gertz v. Welch, Inc., [418] U. S. [323], 94 S. Ct. 1997, 41 L. Ed. 2d 789. Rather the sole question we need decide is whether the Court of Appeals erred in setting aside the jury's verdict."[20]

---

**19.** Mr. Justice Goldberg in his concurring opinion in *New York Times*, at 301, footnote 4, observed:

"In most cases, as in the case at bar, there will be little difficulty in distinguishing defamatory speech relating to private conduct from that relating to official conduct. I recognize, of course, that there will be a gray area. The difficulties of applying a public-private standard are, however, certainly, of a different genre from those attending the differentiation between a malicious and nonmalicious state of mind. If the constitutional standard is to be shaped by a concept of malice, the speaker takes the risk not only that the jury will inaccurately determine his state of mind but also that the jury will fail properly to apply the constitutional standard set by the elusive concept of malice."

**20.** Decided eight to one, the lone dissenter being Douglas, J., the opinion

*Cox Broadcasting Corporation v. Cohn*, 95 S. Ct. 1029, decided 3 March 1975, does not disturb our view. Also an invasion of privacy action, the alleged defamation related to the commission of crime, prosecutions resulting therefrom, and judicial proceedings arising from the prosecutions. The Court [21] found that these matters, as of public record, were events of legitimate concern to the public. 95 S. Ct. at 1046. It held that the State may not impose sanctions on the accurate publication of the name of a rape victim obtained from public records — more specifically from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection. *Id.*, at 1044-1045. In determining the case, the Court referred to and applied the language of *Garrison v. Louisiana, supra,* at 72, n. 8, where it recognized that "different interests may be involved where purely private libels, totally unrelated to public affairs, are concerned; therefore, nothing we say today is to be taken as intimating any views as to the impact of the constitutional guarantees in the discrete area of purely private libels." 95 S. Ct. at 1044. It noted, *id.,* "In similar fashion, Time v. Hill, [385 U. S. 374], expressly saved the question whether truthful publication of very private matters unrelated to public affairs could be constitutionally proscribed."

We are aware that the dissenting opinion of Mr. Justice

of the Court discussed the "actual malice" definition as one made "with knowledge that [a defamatory statement] was false or with reckless disregard of whether it was false or not" and referred to it as "a term of art, created to provide a convenient shorthand for the standard of liability that must be established before a State may constitutionally permit public officials to recover for libel in actions brought against publishers. As such, it is quite different from the common-law standard of 'malice' generally required under state tort law to support an award of punitive damages. In a false-light case, common law malice — frequently expressed in terms of either personal ill will toward the plaintiff or reckless or wanton disregard of the plaintiff's rights — would focus on the defendant's attitude toward the plaintiff's privacy, not towards the truth or falsity of the material published." 95 S. Ct. at 469-470.

**21.** White, J. delivered the opinion of the Court, in which Brennan, Stewart, Marshall, Blackmun, and Powell, JJ., joined. Powell, J., filed a concurring opinion. Burger, C. J., concurred in the judgment. Douglas, J., filed an opinion concurring in the judgment. Rehnquist, J., filed a dissenting opinion, not on First Amendment grounds, but on lack of jurisdiction.

White in *Gertz* can be read as construing the majority holdings as applying to all defamation including that purely private. Pointing out that for some 200 years the law of defamation and right of the ordinary citizen to recover for false publication injurious to his reputation have been almost exclusively the business of state courts and legislatures, he thought that, using the First Amendment "as the chosen instrument, the Court, in a few printed pages, has federalized major aspects of libel law by declaring unconstitutional in important respects the prevailing defamation law in all or most of the 50 States . . . As I see it there are wholly insufficient grounds for scuttling the libel laws of the States in such wholesale fashion, to say nothing of deprecating the reputation interest of ordinary citizens and rendering them powerless to protect themselves." 418 U. S. at 370. He thought that "the changes wrought by the Court's decision cut very deeply." *Id.*, at 371. See 375-380 for a discussion of the impact of the decision on the traditional law. The Chief Justice, in his dissenting opinion, did not read "the Court's new doctrinal approach in quite the way" Mr. Justice White did, frankly saying, "I do not know the parameters of a 'negligence' doctrine as applied to the news media." At 355. The majority opinion answered Mr. Justice White, at 347, n. 10.

If Mr. Justice White does in fact believe that the majority opinion precludes State control of purely private defamation, it is manifest that we construe it otherwise.[22] But as we indicated, speaking for the Court later in *Cox*, he

---

**22.** Several courts have considered the impact of *Gertz* upon state defamation law. Cera v. Mulligan, 358 N.Y.S.2d 642 (N.Y. 1974), decided 6 August; Helton v. United Press International, 303 So. 2d 650 (Fla. 1974), decided 7 November; Firestone v. Time, Inc., 305 So. 2d 172 (Fla. 1974), decided 11 December; Aafco Heating & Air Con. Co. v. Northwest Pub., Inc., 321 N.E.2d 580 (Ind. 1974), decided 30 December. None of these decisions, however, attempts to analyze the application of *Gertz* to purely private libel and slander. We note that the Court of Appeals of Indiana, interpreting the free speech clause of its constitution and exercising the *Gertz* option to define its own standards of constitutional privilege for defamation of private individuals, has rejected *Gertz* and reasserted *Rosenbloom* and its emphasis on "public issues." Therefore, in Indiana, a state constitutional privilege attaches to defamation of a private individual arising out of a matter of "general or public interest."

expressly left open the impact of the First Amendment on purely private libels.

What we decide in this opinion is that the prolific *New York Times* and its progeny, including *Gertz*, did not impress on purely private defamation the privilege arising from First Amendment guarantees of free speech and press, thus leaving State law in that area in full force and effect. Where the *Gertz* holdings are applicable, however, we think that they are not restricted to media cases.

The precise holding in *Gertz* with regard to liability for defamation of a private person referred broadly to "a publisher or broadcaster". The repeated references to the communications media, however, seemed to imply that its holdings were limited to the media context. Mr. Justice Powell, concurring in *Cox*, said of his opinion in *Gertz*, "In *Gertz* we held that the First Amendment prohibits the States from imposing strict liability for *media publication* of allegedly false statements that are claimed to defame a private individual." 95 S. Ct. at 1048. (emphasis added). Some commentators suggest that "[t]he language employed seems to indicate that the Court's new rules apply only when a media institution is the defendant." Brosnahan, *supra*, 26 Hastings L. J. at 793. See Frakt, *supra*, 6 Rutgers — Camden L. J. at 507-512. We reject this suggestion. The *Gertz* majority characterizes its opinion as another attempt "to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." 418 U. S. at 325. Several Supreme Court cases have applied the constitutional privilege in the absence of a media defendant. *Garrison v. Louisiana, supra; Rosenblatt v. Baer, supra; St. Amant v. Thompson, supra; Henry v. Collins, supra.*[23] The Court has specifically applied

---

**23.** In *Garrison*, the local district attorney was tried for criminal libel for comments concerning local judges made at a press conference. In *Rosenblatt*, an unpaid columnist for a local newspaper was sued because his column criticized the management of a county ski recreation area. In *St. Amant*, a candidate for public office was sued for comments made during a televised speech. In *Henry*, an individual who had been arrested by the chief of police sent a letter to the county deputy sheriff and read a statement to several wire services (which statement was published in several

the *New York Times* standard to cases arising from labor disputes. *Branch No. 496, Nat'l. Ass'n. of Letter Carriers v. Austin*, 418 U. S. 264 (1974); *Linn v. Local 114, United Plant Guard Workers*, 383 U. S. 53 (1966). Although these decisions were based on federal labor law rather than the First Amendment, they indicate that the Court thought the constitutional privilege appropriate when there was no media involvement. Whatever special status the media enjoy, its protection is based upon its role as the primary disseminator of public information. Thus, when the *Gertz* majority expressed anxiety over the possibility of self-censorship by the news media, its resultant effect on public debate is the major concern. As the Court emphasized in *Time v. Hill, supra*, at 389: "Those guarantees are not for the benefit of the press so much as for the benefit of all of us. A broadly defined freedom of press assures the maintenance of our political system and an open society." To restrict the limitations in *Gertz* so that they apply only to media defendants would protect only one source of public information.[24] Non-media defendants, such as the private citizen, may also be an important source of public interest items. To leave them unprotected would defeat the whole purpose of the constitutional privilege.

Further, we think that to restrict the *Gertz* holdings to the media would pose problems of application resulting in chaos. Even under a definition of "media" as "a means of mass communication, such as newspapers, magazines, or television",[25] there are many gray areas. Is a daily newspaper with general circulation or a nationally distributed magazine to be distinguished from an industry newsletter, or a bi-monthly company magazine? Should the amateur radio operator have the same protection as the

---

newspapers) which charged that the arrest was a "diabolical plot". See 158 So. 2d 28, 31 (Miss. 1963).

**24.** The Court noted in *Butts*, 388 U. S. at 150: "The guarantees of freedom of speech and press were not designed to prevent 'the censorship of the press *merely*, but any action of government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential' " (emphasis added)

**25.** *The American Heritage Dictionary of the English Language* (1969).

commercial broadcaster? What is the status of credit reports, trade magazines, and publications of professional associations, fraternal orders, service clubs and social societies? The key to the application of the *Gertz* holdings must be, in our opinion, whether the communication is a matter of general or public interest, not its media origin.

For the reasons set out we conclude that the constitutional privilege established by *New York Times,* as explicated by its progeny, is not available to Jacron Sales Co., Inc. in its defense of the defamation action brought by Jack Sindorf.

> *Judgment reversed; case remanded for a new trial; costs to be paid by appellee.*