Elmer GERTZ, Plaintiff-Appellant,

v.

ROBERT WELCH, INC., Defendant-Appellee.

Elmer GERTZ, Plaintiff-Appellee,

v.

ROBERT WELCH, INC., Defendant-Appellant.

Nos. 71–1174, 71–1175.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 31, 1971.

Decided Aug. 1, 1972.

Rehearing and Rehearing En Banc Denied Sept. 7, 1972.

Certiorari Granted Feb. 20, 1973. See 93 S.Ct. 1355.

Wayne B. Giampietro, Elmer Gertz, Chicago, Ill., for Gertz.

James A. Boyle, Jr., Chicago, Ill., Clyde J. Watts, Oklahoma City, Okl., for Welch.

Before KNOCH, Senior Circuit Judge, and KILEY and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Plaintiff's appeal[1] from an order, 322 F.Supp. 997, entering judgment in favor of defendant notwithstanding the jury's $50,000 verdict presents two questions: (1) whether the First Amendment privilege as construed in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, protects defendant's false and scurrilous comments about the plaintiff; and (2) if the privilege does apply, was the evidence insufficient to permit the jury to find that defendant's comments were made "with 'actual malice'—that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." Id. at 279–280, 84 S.Ct. at 726.

Plaintiff is a reputable lawyer. Defendant published an article describing him as a "Communist-fronter," "Leninist," and participant in various "Marxist" and "Red" activities. The author of the article is not a party and did not testify. We assume, without deciding, that, as the district court held, the article was libelous *per se* as a matter of Illinois law and that its author was either deliberately or recklessly mendacious. Our concern is with the tension between the responsibility and the First Amendment freedom of the publisher.

---

1. Defendant cross appeals in No. 71-1175. Our disposition of plaintiff's appeal in No. 71-1174 makes it unnecessary to consider or decide any of the issues raised in the cross appeal.

## I.

The libel was published in the April 1969 edition of *American Opinion*. The magazine's managing editor, one Stanley, explained its editorial policy, method of operation, and how the libelous article was commissioned.

Early in the 1960s, in furtherance of the aims of the John Birch Society, *American Opinion*, and an affiliated publication also edited by Stanley, began to promulgate "information" about a "nation-wide conspiracy to harass and intimidate the police." *American Opinion* published many articles by a number of different authors on this subject. One of them was Alan Stang, the contributor of the libel in suit. Stang was never employed by defendant or any of its affiliates, but had been a regular contributor since 1963. He was recommended to Stanley as an "accurate researcher and analyst" with professional training and experience.[2] His services were engaged by Stanley for special assignments consistent with the aims of the John Birch Society. Between 1963 and 1969 he wrote about 35 articles for Stanley.

Although Stang's articles provoked many letters, some strongly adverse, according to Stanley none challenged the truth of any of Stang's factual averments. Prior to the article in suit, none was the subject of a demand for retraction or a libel suit.

In December, 1968, Stanley requested Stang to prepare an article on the murder trial of a Chicago police officer named Nuccio. Stang accepted, came to Chicago to make an investigation, consulted with Stanley over the long distance telephone a few times, and submitted his completed draft on February 18, 1969, in time for inclusion in the April edition which was scheduled for distribution in early March. Stanley made no effort to verify the accuracy of anything said in Stang's article. Based on statements in the text, Stanley drafted an introductory comment[3] and captions for illustrations.[4] Before the article was conceived, Stanley, whose office is in Boston, had never heard of the plaintiff.

The article is 18 pages long. It is concerned with the trial and conviction of officer Nuccio for the crime of murdering a 17-year old boy named Nelson. The article is intended to persuade the reader that Nuccio was the victim of a "frame-up," and that the frame-up was part of a national conspiracy to discredit local police forces; the purpose of that conspiracy is to lay the groundwork for

---

2. In his affidavit in support of defendant's motion for summary judgment, Stanley stated in part:

"6. My first acquaintance with Allen Stang [sic] came as a result of the personal recommendations of two men. They are, Samuel L. Blumenfeld, an editor formerly with Rinehart & Company, the Viking Press, The World Publishing Company, and Grosset & Dunlap. The other person recommending Mr. Stang was Noel E. Parmentel who was an essayist for several publications, among which were the *New Yorker*, *Esquire* and *National Review*. He was also a television writer and producer. Both Mr. Blumenfeld and Mr. Parmentel stressed Mr. Stang's ability as an accurate researcher and analyst.

"7. I was also advised that Allen Stang [sic] held an B. A. degree from City College of New York and a Masters degree from Columbia University. Further, that he was a business editor for Prentice-Hall Inc. and was a professional writer and researcher for NBC and for such network features as *Mike Wallace Interview* and *Biography*."

3. "Alan Stang is a former business editor for Prentice-Hall, Inc., and a television writer, producer, and consultant. Mr. Stang is a frequent contributor to AMERICAN OPINION and is author of the Western Islands best-sellers, *It's Very Simple* and *The Actor*. Alan Stang has just returned from an investigative trip to Chicago, where he conducted extensive research into the Richard Nuccio Case."

4. For example:
"Officer Richard Nuccio, shown here with one of his three children, was framed for murder"; and "Elmer Gertz of Red Guild harasses Nuccio."

the creation of a national police force, which, in turn, is a step toward a totalitarian state.

The article purports to analyze the evidence against Nuccio so incisively that the falsity of several witnesses' testimony at Nuccio's trial, and the error of the trial judge's finding of guilt, will be manifest to the reader.[5]

Plaintiff is mentioned because he was retained by the Nelson family to assert a civil claim for damages against Nuccio. In that capacity, he attended the coroner's inquest into Nelson's death. Notwithstanding his limited, professional interest in the matter, the article implied that plaintiff was the architect of a gross miscarriage of justice. A purported relationship to a nationwide conspiracy was suggested, in part, by frequent references to the National Lawyers Guild, of which plaintiff had been a member and which Stang repeatedly described as a Communist front.

About 42,000 copies of the magazine were distributed nationally and about 86,000 reprints were printed, of which about 5,000 were sold or given away in Illinois. The article came to plaintiff's attention because a copy was handed to his partner's wife while she was shopping. He promptly filed this libel action in the federal court, alleging that various statements in the article were false and defamatory.

Ruling on various pretrial motions, the district court held as a matter of law that the publication was libelous *per se*, and that applicability of the *New York Times* standard depended on issues of fact that could not be resolved on summary judgment

At the trial plaintiff established that defendant had made no independent verification of any of the statements in Stang's article, that critical comments about plaintiff were false and unsupported, and that plaintiff was a well known and well regarded member of the Illinois bar.[6] Defendant sought to prove that it was justified, on the basis of past experience, in assuming, without checking before publishing it, that Stang's article was accurate. Defendant also offered to prove that it did in good faith seek to verify the statements about plaintiff after the suit was filed, but the court sustained plaintiff's objection to the relevance of this testimony.

No proof of actual damages was offered. Under the court's instructions, the jury was permitted to presume injury as a matter of law. As noted, it assessed plaintiff's damages at $50,000. The district court set aside the verdict and granted defendant's motion for judgment n. o. v. In a thorough memorandum, the court concluded that even if plaintiff himself was not a public figure, the subject matter of the article was clearly of public interest,[7] and that

5. The district court summarized the article:
"A closer examination of the article shows that its theme was more general and far reaching than just the trial of one Chicago policeman for murder. Instead, it painted the picture of a conspiratorial war being waged by the Communists against the police in general. Caught up in the web of the alleged conspiracy, aside from Gertz, was such a disparate cast of characters as the Lake View Citizens Council, the Walker Report, a Roman Catholic priest, and the Chicago *Seed* (an underground newspaper). In fact, although Gertz's picture was displayed in the body of the article, he did not play a very prominent role in the article's exposé of the purported war on police."

6. The district court stated:
"At trial, Gertz testified as to his stature and reputation in the community. He is a prominent attorney in Chicago, having represented clients who sometimes command a wide following in the press and media. He has written books, articles and reviews which have enjoyed wide circulation. He has appeared frequently on radio and television, and has delivered numerous speeches. And he has long been involved in civic affairs."

7. "By analogy to the above cases, and to those cited in Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858, at 861, n. 4 [(5th Cir. 1970)], I think that the subject matter of 'Frame-Up' was clearly one

although defendant's failure to check the accuracy of the article was negligent, the evidence presented at the trial was not sufficient to support a finding of actual malice or reckless disregard for the truth.

## II.

Plaintiff's principal contention on appeal is that the standard of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, is inapplicable because he is not a public figure and, insofar as the article related to him, it did not concern a matter of public interest.

■ Plaintiff's considerable stature as a lawyer, author, lecturer, and participant in matters of public import undermine the validity of the assumption that he is not a "public figure" as that term has been used by the progeny of *New York Times*. Nevertheless, for purposes of decision we make that assumption and test the availability of the claim of privilege by the subject matter of the article. The question then is whether the article, taken as a whole, and more narrowly in its references to plaintiff, is of any *significant* public interest.[8]

Considering either the article's specific topic—the trial of a Chicago police officer for the crime of murder—or its broader theme—the possible existence of a nationwide conspiracy to discredit local police officers—it is clear that the district court was correct in holding that there is significant public interest in the subject matter of the article. Discussion and debate about matters of this character merit the kind of First Amendment protection that the Supreme Court described in New York Times Co. v. Sullivan and later cases extending its rationale to include not only comment on public officials, but public figures and public issues as well. See Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 47–52, 91 S.Ct. 1811, 29 L.Ed.2d 296 (opinion of Mr. Justice Brennan).

■ It is less clear, however, that the false comments about the plaintiff are worthy of the same protection. It is one thing to omit the word "alleged" from an otherwise accurate comment on a newsworthy subject;[9] it is quite another to include a gratuitous and collateral remark about a participant in a public controversy. The omission, even if it makes the comment false, does not enlarge its subject matter beyond the area in which First Amendment protection is properly afforded. But the addition of

of public interest protected by the First and Fourteenth Amendments. A Chicago policeman's killing of a criminal suspect, and the policeman's subsequent indictment for murder at a time when the police generally were the subject of attacks within the community, commanded wide public attention and interest. By representing the victim's family in litigation brought against the policeman, Gertz thrust himself into the vortex of this important public controversy. Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 at 155, 87 S.Ct. at 1991. In affording First Amendment protection to defendant's publication, I reiterate that Gertz played a small part in the vast sweep of the whole article. What this court concerns itself with primarily is the public's right to become informed on a matter of public interest, rather than with any right to know about persons who have injected themselves into the limelight on that matter. See United Medical Laboratories v. Columbia Broadcasting System, 404 F.2d 706 at

712 [(9th Cir. 1968), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454]. The penumbra of First Amendment protection falls equally on references to Gertz, the Lake View Citizens Council, the policeman charged with murder, and the Chicago *Seed*."

8. With deliberation we have included the word "significant" in our statement of the question because we are convinced that areas of privacy remain beyond the coverage of the *New York Times*' protective shield. In our view mere public curiosity about private matters is not the kind of "public interest" that the standard comtemplates. See Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 44 n. 12, 45 n. 13, 48, 91 S.Ct. 1811, 29 L.Ed.2d 296 (opinion of Mr. Justice Brennan).

9. See Rosenbloom v. Metromedia, 403 U.S. 29, 55, 91 S.Ct. 1811, 29 L.Ed.2d 296 (opinion of Mr. Justice Brennan); Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45.

an unnecessary and irrelevant comment about a private individual is not automatically protected simply because it is contained in an article dealing generally with an important subject. Otherwise a few introductory platitudes might be used as a justification for false and destructive invasions of the privacy of ordinary citizens. *Cf.* Kois v. Wisconsin, 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972).

■ In this case, the alleged "Communist front" associations of the lawyer for the Nelson family were quite irrelevant to the question of Nuccio's guilt or innocence of the crime of murder. They were inserted in order to develop the thesis about a national conspiracy against the police. To the extent that these comments lent any support to that thesis, they were either false or unconvincing. Although more credible and respectable authors than Stang or Stanley have written on the same theme,[10] we may also assume that the article's basic thesis is false. Nevertheless, under the reasoning of New York Times Co. v. Sullivan, even a false statement of fact made in support of a false thesis is protected unless made with knowledge of its falsity or with reckless disregard of its truth or falsity. It would undermine the rule of that case to permit the actual

falsity of a statement to determine whether or not its publisher is entitled to the benefit of the rule.

If, therefore, we put to one side the false character of the article and treat it as though its contents were entirely true, it cannot be denied that the comments about plaintiff were integral to its central thesis. They must be tested under the *New York Times* standard.

### III.

There is no evidence that Stanley actually knew that Stang's article was false; defendant did not "deliberately publish falsehoods." The question is whether the publication was made recklessly. The Supreme Court has made two propositions abundantly clear. Both, as well as a third consideration which we shall mention, support the district court's appraisal of the issue.

■ First, the mere fact that a publisher fails to verify the accuracy of defamatory statements in an article submitted by an author whom he could reasonably assume to be trustworthy is not sufficient to establish a reckless disregard for the truth. On several occasions the Court has expressly stated that the record must reveal a "high degree of awareness of . . . probable falsity" before a publisher may be found to have acted recklessly.[11] In this case

---

10. See, *e. g.*, Inbau, Behind Those "Police Brutality" Charges, a 1966 *Reader's Digest* article reproduced in the Supplemental Appendix at p. 117.

11. St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262; Beckley Newspapers Corp. v. Hanks, 389 U.S. 81 84–85, 88 S.Ct. 197, 19 L.Ed.2d 248; Garrison v. Louisiana, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125. In his opinion in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, Mr. Justice Harlan stated the standard for plaintiffs who are not public figures as merely requiring " . . . a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Id.* at 155, 87 S.Ct. at 1991. However, in that case, the publisher had been notified prior to pub-

lication, both by the plaintiff and by his daughter, that the material about to be printed was false. *Id.* at 161 n. 23, 87 S.Ct. 1975. Moreover, as we read the subsequent opinions, although Justices Stewart and Marshall, and perhaps Justice White, may have adopted Mr. Justice Harlan's less severe standard (see Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 57–62, 91 S.Ct. 1811, 29 L.Ed.2d 296 (opinion of Mr. Justice White), 62–78, 91 S.Ct. 1811 (opinion of Mr. Justice Harlan), 78–87, 91 S.Ct. 1811 (opinion of Mr. Justice Marshall with whom Mr. Justice Stewart joined), at least the Chief Justice and Justices Douglas, Brennan and Blackmun have unequivocally rejected it. Thus, the majority of the present Justices who have spoken to the point would not relax the *New York Times* standard in a case not involving a public official.

there is no evidence that Stanley knew anything at all about plaintiff except what was contained in Stang's article.

■ Second, the Court has plainly stated that the evidence establishing reckless disregard for the truth must be clear and convincing, and that an appellate court has an independent obligation to make its own analysis of the record before a finding that a comment was reckless may be approved.[12] Unquestionably, in a close case the policy of encouraging free and uninhibited expression is to be preferred over the conflicting policy of deterring irresponsible defamatory comment. Apart from the failure to verify Stang's facts, and an apparent disposition to assume that a lawyer who could file a civil rights case against a policeman may well be a "Communist fronter," there is no evidence that Stanley acted recklessly within the Supreme Court's definition of that term. To assume that Stanley must have known, on the basis of information received from Stang over the telephone or from some other source,

that the comments about plaintiff were false, would itself be reckless. Our examination of the record satisfies us that "'the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands. . . .' 376 U.S., at 285–286, 84 S.Ct. 710." Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 83, 88 S.Ct. 197, 199, quoting from the *New York Times* case.[13]

■■ Third, if the issue were doubtful, we would defer to the conclusion of the trial judge. Having heard the testimony and observed Stanley on the witness stand, and even though he expressed understandable concern about the wisdom of the rule he felt obligated to apply, he concluded unequivocally that the evidence did not meet the New York Times Co. v. Sullivan standard.[14]

■ Finally, by reference to matters not in evidence, plaintiff in effect asks us to take judicial notice of a reckless disregard for the truth on the part of the John Birch Society and its affiliates.[15] Unquestionably, a judge's sym-

12. New York Times Co. v. Sullivan, 376 U.S. 254, 285–286; Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 55, 91 S.Ct. 1811, 29 L.Ed.2d 296 (opinion of Mr. Justice Brennan); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 83, 88 S.Ct. 197, 19 L.Ed.2d 248.

13. One distinction which is lost in some of plaintiff's arguments should be kept in mind. "[I]ll will toward plaintiff or bad motives, are not elements of the *New York Times* standard." Rosenbloom v. Metromedia, 403 U.S. 29, 52 n. 18, 91 S.Ct. 1811, 1824, 29 L.Ed.2d 296 (opinion of Mr. Justice Brennan). Thus, the kind of malice which will, for example, defeat a conditional privilege in the traditional tort law of libel, will not satisfy the *New York Times* standard. However bad his motives, a publisher is protected by the First Amendment as long as the allegedly libelous statements were not made with knowledge of falsity or with reckless disregard of whether they were true or false.

14. "THE COURT: I can say now, without any question and it will appear of record in the case, that on the basis of the evidence that I have heard, that if I—if I should hold, or some other court should hold, that he is a public figure, that so

far as the rest of the evidence is concerned, I would direct a verdict on the question of malice, on the evidence that I have heard. I wouldn't even submit it to the jury." S.A. 88.

15. Plaintiff makes three arguments that were not pressed below. (1) He contends that recklessness is established by the fact that representatives of the John Birch Society have previously referred to great Americans, such as President Eisenhower, as "Communists," and that certain of its procedures contemplate the deliberate use of propaganda that may well be inaccurate. This contention is unsupported by any evidence in the record. Plaintiff does argue that he was prevented from introducing all of his evidence on actual malice because the trial court had previously ruled—contrary to its reassessment of the situation at the time of the motion for judgment n. o. v.—that the *New York Times* standard did not apply. However, plaintiff did present evidence of malice (both the "constitutional" and the "ill will" type) to support his damage claim and no such evidence was excluded; at least he points to no occasion when he made an offer of proof of relevant evidence which was refused. Even if the

pathetic reaction to the point of view expressed in an article which has been found to contain libelous matter may make it easier for him to afford a publisher First Amendment protection.[16]

We cannot, however, apply a fundamental protection in one fashion to the New York Times and Time Magazine and in another way to the John Birch Society.[17] Whether we are moved to applaud or to despise what is said, our duty to defend the right to speak remains the same.

The judgment is affirmed.

KILEY, Circuit Judge (concurring).

I concur. Judge Stevens has written a persuasive opinion. It is with considerable reluctance, however, that I concur. The reluctance is due to my fear that we may have in this opinion pushed through what I consider the outer limits of the First Amendment protection against liability for libelous statements and have further eroded the interest of non-"public figures" in their personal privacy.

Gertz, a reputable attorney, is virtually called a Communist in an article written by Stang and adopted by Stanley without the latter making any inquiry on his own as to whether there was a reasonable basis for calling Gertz a Communist.

This is not the *Rosenbloom* case, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Rosenbloom was the publisher of "nudist magazines," and the news broadcast by defendant implicitly referred to Rosenbloom as a "smut distributor" and a "girly-peddler." The involvement of the non-"public figure" with an issue of public interest is a consideration which moved the Supreme Court to apply the *New York Times* rule in *Rosenbloom*. I cannot find that Gertz was closely involved with the asserted national Communist conspiracy, as Rosenbloom was with the "smut literature racket."

Yet Judge Stevens shows that the trend of the Supreme Court decisions requires "in this close case" the conclusion that the district court did not err in entering the judgment for defendant, notwithstanding the verdict for Gertz.

references to President Eisenhower had been offered, such evidence would not meet the *New York Times* standard. Plaintiff does not contend that Stanley knew him or anything about him when the article from Stang was received. At most the "Eisenhower" evidence tends to prove that Stanley would be less disposed than another editor to question the author's characterization of plaintiff. (2) He contends that continued distribution of the April edition of *American Opinion* after this litigation was commenced establishes defendant's recklessness; however, defendant offered evidence for the purpose of proving a good faith post-complaint attempt to verify the charges, and plaintiff persuaded the court to exclude such evidence on the ground that " . . . anything that was done after the publication of the article [is] entirely irrelevant to these proceedings." S.A. 104. (3) Plaintiff seems to contend, on appeal, though he never so argued at trial, that

since Stang was described as a "contributing editor" in later issues of the magazine, though not in the April 1969 issue, that defendant should be held liable on a *respondeat superior* doctrine for the malice of Stang. We do not find the later "contributing editor" characterization, in itself, sufficient to change the free-lance character of Stang's relationship with defendant. No other evidence of an employer-employee relationship was proffered. Thus, we also find no error in the trial court's refusal to order defendant to produce Stang for examination as an adverse witness.

16. See Kalven, The New York Times Case; a Note on "the Central Meaning of the First Amendment," 1964 Sup.Ct.Rev. 191, 200.

17. See Police Department of the City of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).