# JACRON SALES CO., INC. *v.* SINDORF

[No. 66, September Term, 1975.]

*Decided January 8, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Albert D. Brault,* with whom were *Brault, Scott & Brault* on the brief, for appellant.

*Barry J. Nace,* with whom were *Davis & Nace* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

We are asked here to determine the extent to which the First and Fourteenth Amendments to the Federal Constitution are applicable to actions for defamation by private individuals against defendants who are not

publishers or broadcasters; alternatively, we shall decide as a matter of state law whether the law of defamation should be changed in view of recent decisions of the Supreme Court. *See Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974). These questions arise from an action for slander brought by appellee, Jack Sindorf (Sindorf), against his former employer, Jacron Sales Co., Inc. (Jacron). When the case came on for trial before a jury in the Circuit Court for Prince George's County, the court directed a verdict for Jacron at the close of all the evidence. On appeal, the Court of Special Appeals reversed the judgment and remanded the case to the circuit court for a new trial. *Sindorf v. Jacron Sales Co.*, 27 Md. App. 53, 341 A. 2d 856 (1975). We then granted certiorari.

Early in 1972, Sindorf entered the employ of Jacron, a Philadelphia-based company, as a construction tools salesman. Sindorf submitted a letter of resignation terminating that relationship some 18 months later, and within a few days thereafter began working in a similar capacity for a Maryland company known as the Tool Box Corporation. In his letter of resignation to Jacron, Sindorf had acknowledged that he was in possession of inventory belonging to Jacron worth $2,451.77, and further stated that although he regarded the material in his possession as part payment of commissions due him, he would return the property "at such time as" he received the sum of $2,561.50, representing unpaid commissions of $2,100 and other miscellaneous amounts owed to him by Jacron. In addition to enclosing invoices for the inventory in his possession, he expressed his regret at the need for proceeding in such a manner, which was pursuant to the advice of counsel, but noted that his efforts to "collect the money" due him "through normal business channels" had been unsuccessful.

Within two days after he commenced his employment with Tool Box, Sindorf was asked to come from his Pennsylvania home to Maryland for a conference with William R. Brose (Brose); the president of the company. At that meeting, Brose related a recorded telephone conversation between him and one Robert Fridkis (Fridkis),

vice president of Jacron Sales of Virginia, a subsidiary of Jacron, who had never been Sindorf's employer.[1] The tape recording was played for the jury, and a transcript of the dialogue was received in evidence.[2] As related by Brose, the substance of Fridkis' statement was that there were "quite a few cash sales and quite a bit of merchandise that were uncounted [sic] for." This suggested to Brose, according to his testimony, that possibly Sindorf "had taken items, either for possibly for his own use . . . or for a cash sale," *i.e.*, implying that they had been stolen by Sindorf. When confronted by Brose with Fridkis' statements, Sindorf branded them as untrue; furthermore, despite an "extremely careful" check of the Tool Box inventory entrusted to Sindorf during his nine months of employment, nothing was ever found to be missing. We note that neither in the Court of Special Appeals nor in this Court has appellant contended that Fridkis' statements did not constitute slander *per se.*

Testimony revealed that Fridkis had placed the call to Brose on instructions from the president of the parent corporation in Philadelphia. Those instructions, however, had not implicated Sindorf in any theft or other criminal conduct. In the president's own words, he told Fridkis:

". . . to call the Tool Box and see if Mr. Sindorf was working for them. We explained to Bob how the man had left us, keeping the merchandise in his possession, our merchandise, and we wanted to verify his employment, whether he was working there while he was still on our payroll or had he just started with Tool Box."

Apparently, when Fridkis reported to the president the outcome of his discussion with Brose, he merely "verified [Sindorf's] employment. . . ."

In directing a verdict for the defendant, the trial court ruled that although Sindorf had established a case of slander

---

1. Mr. Fridkis was deceased by the time the case came to trial.

2. Because of its length, we attach as an appendix to this opinion the relevant part of the transcript.

*per se* warranting its submission to the jury, Jacron was protected by a common law conditional privilege which had not been lost because Sindorf had failed "to show actual malice." Shortly after an appeal had been lodged, the Court of Special Appeals ordered the parties to address their briefs, in part, to the decision in *Gertz v. Robert Welch, Inc.*, *supra*, which the Supreme Court had handed down on June 25, 1974, more than two months after the trial of this case. The Court of Special Appeals held that Sindorf had presented sufficient evidence of malice to warrant submission of the question of abuse of the common law conditional privilege to the jury, thus compelling a reversal of the circuit court decision. Further, the Court of Special Appeals said that since the defamatory statements here were of a "purely private" nature, this case was beyond the reach of *Gertz*.

I

Although we too regard this case as one of defamation of a private individual as to a purely private matter, we think the Court of Special Appeals has misread *Gertz* in concluding that the holding there applies "only when a private individual is defamed as to a matter of general or public interest." 27 Md. App. at 90. No consideration of *Gertz*, however, would be productive without first referring, at the very least, to three prior decisions of the Supreme Court: *New York Times Co. v. Sullivan*, 376 U. S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964); *Curtis Publishing Co. v. Butts*, 388 U. S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967); and *Rosenbloom v. Metromedia*, 403 U. S. 29, 91 S. Ct. 1811, 29 L.Ed.2d 296 (1971).

At common law, the only defenses available to a publisher of defamatory material were truth and the common law privileges. Then, in its landmark decision in *New York Times*, the Supreme Court held that in a state libel trial, a public official must establish "malice," defined as a knowing falsity or a reckless disregard for the truth, on the part of the publisher to recover damages for defamatory statements

concerning the plaintiff's official conduct.[3] The traditional defense of truth, the Court held, did not provide adequate protection to the First Amendment rights of the press.

Three years later, in *Curtis Publishing Co. v. Butts, supra,*[4] another unanimous Court expanded the class of plaintiffs subject to the *New York Times* test to include "public figures." Although Mr. Justice Harlan wrote the opinion for the Court, a majority agreed with Mr. Chief Justice Warren's definition of a public figure, which included not only public officials but also those individuals who are "nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." 388 U. S. at 164. The Chief Justice assumed that involvement in public issues or events itself guaranteed access to the means by which defamatory criticism might be controverted.

In *Rosenbloom v. Metromedia, supra,* in an opinion joined by only two other members of the Court, Mr. Justice Brennan appeared to extend the constitutional privilege enunciated in *New York Times* yet another step further by applying it to defamatory falsehoods if the statements concern matters of public or general interest, regardless of the status of the person defamed.[5] The essence of the opinion is this:

> "If a matter is a subject of public or general interest, it cannot suddenly become less so merely

---

**3.** In *New York Times* and in later cases, the Supreme Court explicated the meaning of the new standard. The Court held that under the circumstances, the failure of the New York Times to check the accuracy of the allegedly libelous advertisement which it had published against news stories in its own files did not establish a reckless disregard for the truth. 376 U. S. at 287-88. Later, in St. Amant v. Thompson, 390 U. S. 727, 731, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968), the Court equated reckless disregard of the truth with subjective awareness of probable falsity in stating: "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." The Court has made it plain that the *New York Times* test of knowledge of falsity or reckless disregard of the truth is to be distinguished from malice in the sense of ill-will. *See, e.g.,* Beckley Newspapers v. Hanks, 389 U. S. 81, 88 S. Ct. 197, 19 L.Ed.2d 248 (1967).

**4.** A companion case treated in the same opinion was Associated Press v. Walker, 388 U. S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967).

**5.** A total of five opinions were written in *Rosenbloom.*

because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety. . . ." 403 U. S. at 43.

Subsequent history has proved the separate dissenting opinions of Mr. Justice Harlan and Mr. Justice Marshall more durable than the plurality opinion of Mr. Justice Brennan. Justice Harlan urged in his dissent in *Rosenbloom* that the *New York Times* privilege should not apply to private persons because of the diminished likelihood of "securing access to channels of communication sufficient to rebut falsehoods." 403 U. S. at 70. To this extent, Mr. Justice Marshall, joined by Mr. Justice Stewart, was in general agreement. The disagreement between the two dissenting opinions was over the matter of punitive damages. Justice Harlan was of the view that the states might allow such damages in amounts bearing "a reasonable and purposeful relationship to the actual harm done," 403 U. S. at 75, while Justice Marshall expressed the view that both punitive and presumed damages should not be allowed because they resulted in self-censorship.

Thus was the stage set for *Gertz*. There, the plaintiff was a Chicago attorney prosecuting a civil action for the family of a youth who had been shot and killed by a police officer. The officer had previously been convicted of second degree murder in the incident, but the plaintiff had neither participated in the criminal proceeding nor discussed the officer with media representatives. Nevertheless, the defendant published an article characterizing the plaintiff as the "architect of the criminal prosecution" which it portrayed as part of a nationwide Communist conspiracy to discredit local law enforcement agencies. The article falsely accused the plaintiff of membership in Communist-front organizations and of having a criminal record. After a jury had awarded the plaintiff $50,000 in damages, the trial

court, anticipating *Rosenbloom* and granting the defendant's motion for a judgment n.o.v., ruled that the *New York Times* standard should govern even though the plaintiff was neither a public official nor a public figure. On appeal, the United States Court of Appeals upheld the trial court on the ground that, regardless of whether the plaintiff was a public figure, the defamatory statements concerned an issue of significant public interest. *Gertz v. Robert Welch, Inc.,* 471 F. 2d 801 (7th Cir. 1972).

The Supreme Court, with a majority of five, held that the constitutional privilege articulated in *New York Times* does not extend to defamatory falsehoods concerning an individual who is neither a public official nor a public figure. Rather than expand the *New York Times* standard to falsehoods relating to private persons when made in connection with events of public interest, as the *Rosenbloom* plurality had done, the Court applied a number of restrictions to the law of libel designed to accommodate freedom of the press with the state's interest in protecting a private person's reputation. The Court held that in cases of defamation of private persons (1) the state may not impose liability without fault, but with that limitation may adopt any other standard of media liability, and (2) in cases where the *New York Times* test of knowing or reckless falsity is not met, the state may permit recovery for "actual injury" but not presumed or punitive damages. Such "actual injury" was not confined to out-of-pocket loss, but may include "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." 418 U. S. at 350. After then determining that Gertz was neither a public official nor a public figure, the Court reversed and remanded the case for a new trial.

The Court's shift in emphasis from First Amendment protection of free expression to the state interest in protecting the reputation of the plaintiff who is a private individual represented a rejection of the rationale underlying the plurality opinion in *Rosenbloom.* In sum, the Court held that a private individual deserves a greater degree of protection than does a public figure because the

latter usually has a greater access to the media to rebut defamatory charges and, unlike the private individual, usually has chosen to run "the risk of closer public scrutiny." 418 U. S. at 344. Thus, the *Rosenbloom* test, whether the matter is of "public or general" concern, did not afford sufficient recognition of tHe legitimate state interest in enforcing a remedy for injury to a private person's reputation. Additionally, the *Gertz* Court found the *Rosenbloom* plurality approach unacceptable because it imposed on courts the task of deciding on an "ad hoc" basis what issues were of "general or public interest," a task which the Court doubted the wisdom of committing "to the conscience of judges." 418 U. S. at 346.

The Court of Special Appeals read the *Gertz* holdings to apply only when a private person is defamed as to a matter of general or public interest, and not when the reputation of a private individual is tarnished by a report of a private matter not of general or public concern, that is, a purely private defamation. 27 Md. App. at 90. Hence, the court concluded that since the case before it involved neither a public individual confronted with the *New York Times* privilege, nor a matter of public or general interest, it was "free to define the limits of recovery," 27 Md. App. at 90, because "[s]tate law [was] in full force and effect." *Id.* at 93. Accordingly, the Court of Special Appeals did not apply *Gertz* and, since it was of the view that there was sufficient evidence of common law malice to defeat the conditional privilege protecting the defendant, reversed and remanded for a new trial. We are not fully in accord with these views.

The Court of Special Appeals' conclusion that the *Gertz* holding applies only where a private person is defamed in regard to a matter of public or general interest finds no support in the *Gertz* decision itself. To the contrary, the opinion for the Court by Mr. Justice Powell is punctuated with manifestations that the "public or general interest" test was being jettisoned. 418 U. S. at 343-44. The Court stated that the "extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge [the] legitimate state interest to a degree that [it found] unacceptable," and

declared that the " 'public or general interest' test for determining the applicability of the *New York Times* standard to private defamation actions inadequately serves both of the competing values at stake." *Id.* at 346. That *Gertz* was regarded as having rejected the *Rosenbloom* plurality opinion and as a withdrawal "to the factual limits of the pre-*Rosenbloom* cases" is confirmed by the concurring opinion of Mr. Justice Blackmun, 418 U. S. at 353, which gave Justice Powell's opinion the approval of a majority, and even more forcefully by Mr. Justice White's dissent where he stated that "[t]he Court now repudiates the plurality opinion in *Rosenbloom*. . . ." *Id.* at 378-79.

The very essence of the *Gertz* decision, as we noted early on, was the shift in focus from the protection of free expression, which undergirded *New York Times* and its progeny, including *Rosenbloom,* to the state interest in protecting private persons who have been defamed. It was because the *Rosenbloom* approach did not afford sufficient recognition of this state interest that the *Gertz* Court found it unacceptable and sounded the death knell for the "public or general interest" test as a constitutional requirement. *See* Anderson, *Libel and Press Self-Censorship,* 53 Texas L. Rev. 422, 445 (1975); Brosnahan, *From Times v. Sullivan to Gertz v. Welch: Ten Years of Balancing Libel Law and the First Amendment,* 26 Hastings L. J. 777, 791-92 (1975); Comment, *The Law of Libel — Constitutional Privilege and The Private Individual: Round Two — Gertz v. Robert Welch, Inc.,* 12 San Diego L. Rev. 455, 466 (1975); Note, *Gertz v. Welch: Reviving the Libel Action,* 48 Temp. L. Q. 450, 459 (1975).

The Court of Special Appeals rested its holding that the *Gertz* rules apply only when a private person is defamed concerning a matter of public or general interest on the rationale of *New York Times,* that in response to the command of the First Amendment a constitutional privilege is necessary to protect uninhibited public debate. The Court of Special Appeals reasoned that this rationale applies to private persons only when they are defamed in regard to matters of public or general interest, that public debate is

not fostered when the subject matter is private. As we have stressed, however, this overlooks the gravamen of the *Gertz* holding embodied in the changing emphasis from the value of uninhibited debate to the state interest in protecting private persons "for the harm inflicted on them by defamatory falsehood." 418 U. S. at 341.

Undeniably, the *Gertz* holding effects sweeping changes in the law of defamation. The Court seeks to eliminate in cases of private plaintiffs the threat of self-censorship, the very objective of the *New York Times* rule, but instead of shielding the media from private plaintiffs with the *New York Times* privilege, it does so by protecting them against strict liability as well as presumed and punitive damages. Beyond this, the states are free to fashion their own rules. We read *Gertz* to apply to actions brought by private persons regardless of whether the subject matter of the defamation is one of public or general interest. Accordingly, as a matter of federal constitutional law, those defendants who are protected by *Gertz* would be insulated from strict liability, and presumed and punitive damages in any defamation case maintained by a private person.

## II

This case also presents the question whether a non-media defendant, such as Jacron, is within the class of defendants to be afforded the protection of the *Gertz* holding.[6] It is plain that the holding in *Gertz* was limited to media expression. *See* Brosnahan, *supra*, 26 Hastings L. J. at 792-93; Frakt, *The Evolving Law of Defamation: New York Times Co. v. Sullivan to Gertz v. Robert Welch, Inc. and Beyond*, 6 Rutgers-Camden L. J. 471, 507-509 (1975); Nimmer, *Introduction — Is Freedom of the Press a Redundancy: What Does it Add to Freedom of Speech?* 26 Hastings L. J. 639, 649-50 (1975); *see also* Restatement (Second) of Torts §

---

6. While holding that *Gertz* did not apply to this case because the defamatory remarks here did not concern matters of public or general interest, the Court of Special Appeals nevertheless concluded that *Gertz* was not limited to media cases.

580B, Comment e (Tent. Draft No. 21, 1975). Apart from the fact that the defendant in *Gertz* was a member of the media, whose defamatory act consisted of the publication of a libelous statement, the majority opinion is riddled with references to "publishers and broadcasters," "the press and broadcast media," and "the news media." Similar terms appear in the concurring opinion of Justice Blackmun and the dissenting opinions of the Chief Justice and Justice Brennan. Justice White stands alone in his view that *Gertz* applies to all defamation actions. We must nevertheless make an informed prediction as to whether at some future date the Supreme Court will extend the *Gertz* holding to defamatory expression of any kind by non-media defendants. Even if we were to decide here that the Court will not so extend *Gertz*, we would consider whether, in any event, we should do so as a matter of state law.

The history of *New York Times* provides an instructive analogy. Although that case arose in a media context, the holding contained no caveat restricting its application to media publications; nor has the Supreme Court hesitated to apply it in non-media cases. In *Garrison v. Louisiana*, 379 U. S. 64, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964), the defamatory comments were made during a press conference, and in *St. Amant v. Thompson*, 390 U. S. 727, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968), they were made during a televised speech. In both instances, the media merely served as a vehicle for the defamatory statements by the defendants and the Court focused on free speech and public debate rather than on the protection of the media. In *Henry v. Collins*, 380 U. S. 356, 85 S. Ct. 992, 13 L.Ed.2d 892 (1965), the Court in a short per curiam opinion applied *New York Times* where an individual who had been arrested by a police chief charged in a letter to a deputy sheriff and in a statement read to several wire services that the arrest was a "diabolical plot." Similarly, in non-media cases arising from labor disputes the Court has found the constitutional privilege applicable. *Letter Carriers v. Austin*, 418 U. S. 264, 94 S. Ct. 2770, 41 L.Ed.2d 745 (1974); *Linn v. Plant Guard Workers*, 383 U. S. 53, 86 S. Ct. 657, 15 L.Ed.2d 582 (1966). A number of lower courts have also

applied the *New York Times* standard in non-media cases,[7] and one court has applied *New York Times* in an action by an officer of a private club for defamations arising out of communications between club members concerning his activities. *Evans v. Lawson,* 351 F. Supp. 279 (W.D. Va. 1972).

Nor do we discern any persuasive basis for distinguishing media and non-media cases. The rationale for the application of a constitutional privilege in *New York Times, Curtis* and *Gertz* is that the defense of truth is not alone sufficient to assure free and open discussion of important issues. Issues of public interest may equally be discussed in media and non-media contexts, and the need for a constitutional privilege, therefore, obtains in either case. *See* Restatement (Second) of Torts § 580A, Comment h (Tent. Draft No. 21, 1975); *but cf.* Nimmer, *supra.* The proposition that the press enjoys greater rights than members of the public generally was rejected by the Supreme Court in *Pell v. Procunier,* 417 U. S. 817, 834-35, 94 S. Ct. 2800, 41 L.Ed.2d 495 (1974), where a newspaper argued that it had a constitutional right to interview inmates of a state correctional system despite a regulation prohibiting such contacts.

Wholly apart from any possible Supreme Court holding in the future based on constitutional grounds, we conclude as a matter of state law that the *Gertz* holding should apply to media and non-media defendants alike, and to both libel and slander. As one commentator stated:

> ". . . Regardless of constitutional strictures, it would be a bizarre result as a matter of tort law to hold individual defendants liable without fault while the media were liable only for negligence. The standard tort rationale for strict liability is that it

---

**7.** *See* Noonan v. Rousselot, 239 Cal.App.2d 447, 48 Cal. Rptr. 817 (1966) ("tabloid" campaign material); Rowden v. Amick, 446 S.W.2d 849 (Kansas City, Mo. App. 1969) (letter writing campaign by a disgruntled citizen to other members of the community attacking a deputy marshal who had ticketed defendant's car); *cf.* Richards v. Gruen, 62 Wis. 2d 99, 214 N.W.2d 309 (1974).

serves to spread the cost of injury over all the users of a given product; in short, it is a theory of enterprise liability. Further, an individual's defamatory statement is, on the whole, likely to create a smaller risk of harm than a media publication. Finally, the media are more likely to be aware of the risk of liability, and thus more likely to insure against it. . . ." *The Supreme Court, 1973 Term,* 88 Harv. L. Rev. 41, 148 n. 52 (1974).

Any rule according less favorable treatment to certain types of non-media defendants might well present "difficult questions concerning the roles of the press and other speakers in our society." Anderson, *supra,* 53 Texas L. Rev. at 442-43 n. 95. Furthermore, most non-media private defamations arise in the context of one of the common law privileges; "[t]he completely gratuitous private defamation is rare." Thus, experience suggests that liability without fault is unusual in non-media private defamation cases. Frakt, *supra,* 6 Rutgers-Camden L. J. at 511.

Yet another reason for applying the *Gertz* holding to non-media defendants and to slander as well as libel is the compelling need for consistency and simplicity in the law of defamation. To limit the *Gertz* principles to media defendants and to cases of libel would mean one test, that of *New York Times,* for defamation of public officials and figures; another, which imposes a greater degree of proof than strict liability, and bans presumed and punitive damages, for cases brought by private plaintiffs against media defendants; and at least one more based on existing common law principles for all other defamation, an area of tort law which, wholly apart from the advent of constitutional considerations, has traditionally been noted for its complexity. The rationale for applying the *Gertz* holding to non-media defendants and to slander as well as libel is aptly stated in the Restatement (Second) of Torts § 580B, Comment e (Tent. Draft No. 21, 1975):

". . . As the Supreme Court declares, the protection of the First Amendment extends to

freedom of speech as well as to freedom of the press, and the interests which must be balanced to obtain a proper accommodation are similar. It would seem strange to hold that the press, composed of professionals and causing much greater damage because of the wider distribution of the communication, can constitutionally be held liable only for negligence, but that a private person, engaged in a casual private conversation with a single person, can be held liable at his peril if the statement turns out to be false, without any regard to his lack of fault.

". . . There is little reason to conclude that the states would now be disposed to take the traditional strict liability approach for libel actions against the communications media, which has now been declared unconstitutional, and apply it to slander actions against private individuals, where it has not previously been significant."

### III

We hold, therefore, that the rules announced in *Gertz* apply to cases of libel and slander alike brought against non-media defendants. Consequently, the principles of *Gertz* are applicable to the instant case. We must here decide, however, the standard of liability which should govern this case, recognizing that there cannot be recovery on strict liability. While holding that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability," 418 U. S. at 347, the *Gertz* Court left little doubt of its assumption that most states would adopt a negligence standard. At one point, the Court stated: "Our inquiry would involve considerations somewhat different from those discussed above if a State purported to condition civil liability on a factual misstatement whose content did not warn a *reasonably prudent* editor or broadcaster of its defamatory potential." *Id.* at 348 (emphasis added). In prohibiting punitive damages, the Court stated that such "damages are wholly

irrelevant to the state interest that justifies a negligence standard for private defamation actions." *Id.* at 350. Justice Blackmun, concurring, flatly states that "the Court now conditions a libel action by a private person upon a showing of negligence . . . ," *id.* at 353, and Chief Justice Burger characterizes the majority opinion as introducing to defamation law the concept of "negligence," *id.* at 355. Justice Brennan refers to "a reasonable-care standard," *id.* at 366, and Justice White's dissent contains similar language.

Nevertheless, we are free to adopt a stricter standard than negligence. In the wake of the *Gertz* decision, courts in Colorado, *Walker v. Colorado Springs Sun, Inc.*, Colo., 538 P. 2d 450 (1975), *cert. denied*, 96 S. Ct. 469 (1975), and in Indiana, *Aafco Heating & Air Con. Co. v. Northwest Pub., Inc.*, 321 N.E.2d 580 (Ind. App. 1974), both media-defendant and private-plaintiff cases, have opted, as a matter of state law, for the adoption of the *New York Times* standard of knowing falsity or reckless disregard, but only where the defamatory matter is of public or general interest.[8] The Supreme Court of Illinois, however, in *Troman v. Kingsley Wood*, Ill., 340 N.E.2d 292 (1975), a case involving a media defendant and a private plaintiff, chose a standard of negligence. And in another case decided after *Gertz*, in which a private plaintiff alleged a defamation by a media defendant, a negligence standard was adopted "even though the libel occurred in the reporting of an event of public or general concern." *Stone v. Essex County Newspapers, Inc.*, Mass., 330 N.E.2d 161, 164 (1975). *Cf. Gobin v. Globe Publishing Co.*, 216 Kan. 223, 531 P. 2d 76 (1975) (negligence standard adopted in case of private plaintiff and media defendant for defamation in reporting judicial proceedings).

---

8. It is interesting to note that since both cases involved matters of public or general interest, the courts confined their holdings to that context and offered no hint as to what test they would adopt in other cases. Suffice it to say that any standard less than negligence in media-defendant cases not presenting matters of public or general interest would clearly run afoul of *Gertz* as a matter of federal constitutional law.

In the only other post-*Gertz* case, of which we are aware, that has considered the question, the Wisconsin Supreme Court, in *Calero v. Del Chemical Corp.*, 68 Wisc. 2d 487, 228 N.W.2d 737 (1975), a case which also involved a defamation suit by a private individual against his former employer and thus not involving the media, retained its common law test. It concluded that *Gertz*, by its own terms, did not literally apply because of the non-media defendant context presented in the Wisconsin case. We decline to follow that authority, since the court there simply limited its examination to the question of whether it was bound by *Gertz*.

The adoption of a negligence standard in cases of purely private defamation hardly introduces a radical concept to tort law. The application of the negligence standard in tort cases is so well established that juries can safely be expected to comprehend the term when applied in defamation cases. Nor is the negligence standard unknown to common law defamation. In some jurisdictions, the lack of a reasonable ground to believe in the truth of a published statement is deemed sufficient to defeat a common law conditional privilege. *See* 1 F. Harper & F. James, Law of Torts § 5.27 n. 16 (1956), and the cases therein cited; Restatement of Torts § 601 (1938). And in connection with the issue of publication, the usual rule of strict liability has been relaxed in favor of a negligence standard. W. Prosser, Law of Torts § 113 (4th ed. 1971).

We hold, therefore, that a standard of negligence, as set forth in Restatement (Second) of Torts § 580B (Tent. Draft No. 21, 1975), which we here adopt, must be applied in cases of purely private defamation. Section 580B states:

"§ 580B. *DEFAMATION OF PRIVATE PERSON.*

"ONE WHO PUBLISHES A FALSE AND DEFAMATORY COMMUNICATION CONCERNING A PRIVATE PERSON, OR CONCERNING A PUBLIC OFFICIAL OR PUBLIC FIGURE IN RELATION TO A PURELY PRIVATE MATTER NOT AFFECTING HIS CONDUCT, FITNESS OR ROLE IN HIS PUBLIC CAPACITY, IS

SUBJECT TO LIABILITY, IF, BUT ONLY IF, HE
"(a) KNOWS THAT THE STATEMENT IS FALSE
AND THAT IT DEFAMES THE OTHER,
"(b) ACTS IN RECKLESS DISREGARD OF
THESE MATTERS, OR
"(c) ACTS NEGLIGENTLY IN FAILING TO
ASCERTAIN THEM."

It is to be noted that under the negligence standard which we adopt here, truth is no longer an affirmative defense to be established by the defendant, but instead the burden of proving falsity rests upon the plaintiff, since, under this standard, he is already required to establish negligence with respect to such falsity.

We turn, then, to the quantum of proof by which the plaintiff must establish the fault of the defendant. We address the question merely to dispel any possible notion that the plaintiff must prove negligence by "clear and convincing" evidence. The "clear and convincing" test, applied in the public-official and public-figure sphere, apparently derives from the *New York Times* requirement of "convincing clarity," 376 U. S. at 285-86, with respect to the "actual malice" standard articulated there. *See Rosenbloom v. Metromedia, supra,* 403 U. S. at 30. The *Gertz* opinion, however, does not suggest that the standard of clear and convincing proof must be applied in the negligence context, saying only that the states may adopt any standard except strict liability.

We hold that proof of fault in cases of purely private defamation must meet the standard of the preponderance of the evidence. This is the quantum of proof ordinarily required in other types of actions for negligence, and is apt to be more readily understood by juries.

IV

Essential to the disposition of this case is the status of the common law conditional privileges in Maryland, especially in light of *Gertz*. As we indicated earlier, the trial judge directed a verdict for Jacron on the ground that Sindorf had

failed to present sufficient evidence of "actual malice" to defeat the common law privilege protecting Jacron. In reversing, the Court of Special Appeals held that "the question of malice was properly for the jury." *Sindorf v. Jacron Sales Co., supra,* 27 Md. App. at 72.

It has been suggested that adoption of the negligence standard of fault in defamation cases would have the practical effect of rendering obsolete the common law defense of conditional privilege. *See, e.g.,* Anderson, *supra,* 53 Texas L. Rev. at 443, n. 97; Frakt, *supra,* 6 Rutgers-Camden L. J. at 496-97. The reasoning which underlies this position is that many jurisdictions follow the rule that one of the means by which a conditional privilege may be defeated is by proving negligence on the part of the defendant. F. Harper & F. James, *supra,* § 5.27; W. Prosser, *supra,* § 115. Indeed, the first Restatement of Torts, *supra,* at § 601 expressly adopted such a rule:

> "Except as stated in § 602, one who upon a conditionally privileged occasion publishes false and defamatory matter of another abuses the occasion if, although believing the defamatory matter to be true, he has no reasonable grounds for so believing."

Section 601 thus embodied the common law rule that one was held to have abused a qualified privilege if he did not believe the statement to be true or if he did not have reasonable grounds to believe in its truth. *See* Restatement (Second) of Torts § 580B, Comment l (Tent. Draft No. 21, 1975).

If the rule stated in § 601 of the first Restatement were the law of Maryland, we might well question the efficacy of retaining a conditional privilege defeasible by the very proof of negligence which must be presented to establish falsity and defamation in the first instance. The fault required by *Gertz* to be proved to establish liability would amount to an abuse of, and thereby defeat, a conditional privilege. In Maryland, however, we have never held that negligence is

among the grounds on which the conditional privilege may be forfeited.[9]

The Maryland cases on abuse of conditional privilege are couched in terms of "express malice" or "actual malice." *See, e.g., Evening News Co. v. Bowie,* 154 Md. 604, 611, 141 A. 416 (1928); *Jump v. Barnes,* 139 Md. 101, 111, 114 A. 734 (1921); *Bavington v. Robinson,* 124 Md. 85, 90, 91 A. 777 (1914); *Garrett v. Dickerson,* 19 Md. 418, 450 (1863). The explanation in some of the earlier cases was that malice is an element of the tort of defamation, but is generally presumed in the publication of defamatory matter unless a privilege is established, in which event the presumption is rebutted and malice must be proved. *See Fresh v. Cutter,* 73 Md. 87, 92, 20 A. 774, 25 Am.St.Rep. 575, 10 L.R.A. 67 (1890). Malice was variously defined in the cases as a lack of good faith, ill-will, hostility, or hatred. *See, e.g., Evening News Co. v. Bowie, supra; Deckelman v. Lake,* 149 Md. 533, 536, 131 A. 762 (1926). Excessive publication and unnecessarily abusive language were held to be evidence of malice. *Fresh v. Cutter, supra,* 73 Md. at 93-94.

Express or actual malice represents something more than conduct that is merely negligent. In *Deckelman v. Lake, supra,* the Court, quoting from 17 R.C.L. 321, defined malice as " 'wanton disposition grossly negligent of the rights of others.' " Speaking generally in *Fresh v. Cutter, supra,* 73 Md. at 92, the Court defined malice as "knowingly stat[ing] what was untrue and injurious," but more specifically in *Stevenson v. Baltimore Club,* 250 Md. 482, 243 A. 2d 533 (1968), we defined malice in part as the reckless disregard of truth:

> "The privilege may be lost, however, if the plaintiff in a defamation case can show malice, which in this context means not hatred or spite but rather a *reckless disregard of truth,* the use of unnecessarily abusive language, or other circumstances which would support a conclusion that the

---

**9.** We reject any suggestion to the contrary in the dicta in Simon v. Robinson, 221 Md. 200, 206, 154 A. 2d 911 (1959).

defendant acted in an ill-tempered manner or was motivated by ill-will." 250 Md. at 486-87 (emphasis added).

We repeated the *Stevenson* definition in *Orrison v. Vance,* 262 Md. 285, 295, 277 A. 2d 573 (1971), and thus the reckless disregard standard now appears to be firmly established in Maryland as a test, albeit not the exclusive test, for abuse of a conditional privilege. This being a higher standard than negligence, we retain the common law conditional privilege in Maryland which, in a given case may suffice to avoid liability even though the *Gertz* standard regarding falsity and defamation is met by the plaintiff.[10] It should be noted, however, that in a case where a common law conditional privilege is found to exist, the negligence standard of *Gertz* is logically subsumed in the higher standard for proving malice, reckless disregard as to truth or falsity, and therefore becomes irrelevant to the trial of the case. Were the plaintiff who is confronted with a conditional privilege incapable of proving the malice necessary to overcome that hurdle, it would be of no consequence that he might have met the lesser standard of negligence.

While the question of whether a defamatory communication enjoys a conditional privilege is one of law for the court, whether it has been forfeited by malice is usually a question for the jury. *Hanrahan v. Kelly,* 269 Md. 21, 29, 305 A. 2d 151 (1973); *Jump v. Barnes, supra,* 139 Md. at 112; *Bavington v. Robinson, supra,* 124 Md. at 90; *Fresh v. Cutter, supra,* 73 Md. at 93. We need not belabor this opinion with a detailed summary of the trial testimony. We agree with the Court of Special Appeals that the trial court erred in ruling that there was insufficient evidence of malice, as

---

10. It is interesting to note that the rule of the first Restatement quoted earlier has now been supplanted in the Restatement (Second) of Torts § 600 (Tent. Draft No. 21, 1975), which provides that abuse of a conditional privilege takes place when the defendant publishes a statement knowing it to be false or acting in reckless disregard as to its truth or falsity. This is the same as the constitutional standard used for determining whether liability will be imposed for a defamatory communication about a public officer or public figure. In sum, negligence is no longer sufficient under the Restatement to establish abuse of a conditional privilege.

defined in our cases, to defeat the conditional privilege. Reasonable minds could have concluded that the suggestion of Sindorf's discharge for stealing was not only false, but far exceeded the facts that had been related to Fridkis by the corporation president who had done little more than instruct him to verify Sindorf's employment. This was evidence on which a finding by the trier of fact of malice in the form of reckless disregard of truth overcoming the conditional privilege could have been based. Hence, the Court of Special Appeals was correct in reversing the judgment of the circuit court and in remanding the case for a new trial.

Unless a conditional privilege is found to have existed, the plaintiff shall be required at the new trial of this case to establish the liability of the defendant through proof of negligence by the preponderance of the evidence, and may recover compensation for actual injury, as defined in *Gertz* and outlined earlier, but neither presumed nor punitive damages, unless he establishes liability under the more demanding *New York Times* standard of knowing falsity or reckless disregard for the truth. Should the court determine that a common law conditional privilege existed, the question of its forfeiture vel non shall be governed by the views expressed herein.

> *Judgment of the Court of Special Appeals affirmed; costs to be paid by appellant.*

## APPENDIX

\* \* \*

"Mr. Fridkis: you know, anyway, okey listen, I want to talk to you about your new salesman, Jack Sindorf

"Mr. Brose: yeh

"Mr. Fridkis: ah, ah

"Mr. Brose: he's been working the Ocean City area

"Mr. Fridkis: yeh, you know he, he use to work for Jacron

"Mr. Brose: understand in Philadelphia

"Mr. Fridkis: yeh, Philadelphia and, ah, there was quite a few cash sales and quite a bit of merchandise that was not accounted for

"Mr. Brose: Oh really

"Mr. Fridkis: yeh, so I figured I'd, you know

"Mr. Brose: Oh good heavens

"Mr. Fridkis: So I thought I'd better kind of tip you off about it, you know, watch your stock real, real carefully on trucks and things

"Mr. Brose: yeh

"Mr. Fridkis: when did you hire him, how long

"Mr. Brose: I think today, no officially yesterday I guess

"Mr. Fridkis: Oh, officially yesterday

"Mr. Brose: uh huh

"Mr. Fridkis: Oh, okey cause, ah, ah, someone here says he's been working for you three or four, ah, ah, weeks

"Mr. Brose: God, I never met him that long ago

"Mr. Fridkis: o.k., o.k.

"Mr. Brose: I think, I think the first time I met him was about Thursday or Friday over the phone

"Mr. Fridkis: ah, huh, ah

"Mr. Brose: and he was down yesterday morning and we had a chat and decided he'd like to represent The Tool Box in that area, he said that he'd been working for Jacron in Philadelphia

"Mr. Fridkis: yeh, yeh, well this was what the story was on it and

"Mr. Brose: what, did he get fired

"Mr. Fridkis: ah, yeh, yeh, they were, ah, ah, noticing things, you know what I mean

"Mr. Brose: Oh boy

"Mr. Fridkis: ah, noticing things that, ah, ah, were, ah, some checks came in that were made out to him, you know what I mean

"Mr. Brose: ah huh

"Mr. Fridkis: you know, and ah, ah, they were noticing some stuff that was disappearing and he had about $3000 worth of merchandise on the truck and ah, when they turned the things in it just didn't jive

"Mr. Brose: didn't jive, yeh

"Mr. Fridkis: yeh

"Mr. Brose: good heavens

"Mr. Fridkis: yeh, and well you know, little things, ah, ah, that he had, you know how guys take stuff out of the place there and he doesn't turn a ticket in on it, you know what I mean

"Mr. Brose: oh, oh

"Mr. Fridkis: in other words, odd ball stuff, you know, hey he took out three tools there and, ah, that was three weeks ago and we don't have a ticket on it

"Mr. Brose: oh, oh

"Mr. Fridkis: you know, like what happened to the ticket

"Mr. Brose: I think we have pretty good inventory control. I think, well, ah, we can't watch everything, you and I both know that but you just

"Mr. Fridkis: yeh, well I just, you know, just tipped you off

"Mr. Brose: I appreciate it

"Mr. Fridkis: and kind of watch him very, very carefully so far as this is concerned

"Mr. Brose: Thank you Buddy

"Mr. Fridkis: you know, see whats what, he did a lot of business and this is not a drop for him. Now when he first went out there he was

doing all kinds of business, then as the months went by his business started to get less and less

"Mr. Brose: oh

"Mr. Fridkis: got it, . . .

\* \* \*

"Mr. Fridkis: I tipped you off on this thing you know

"Mr. Brose: yeh, well I sure appreciate your telling me and letting me know about that

"Mr. Fridkis: Well I was curious to see when he started working for you. Had he been working for you at the same time he was working for Jacron in Philadelphia.

"Mr. Brose: Ah

"Mr. Fridkis: got it, got it

"Mr. Brose: Unless he's still on their payroll now, I understand that he was

"Mr. Fridkis: No, no, he's not on the payroll, he was even fired last week I believe, got it

"Mr. Brose: Oh, he told me he was not on their payroll and there was not a written contract or anything so he was open, he was available so

"Mr. Fridkis: yeh, yeh

"Mr. Brose: He seemed like a real nice guy, real nice fellow

"Mr. Fridkis: Well just keep an eye on him that's all and ah, that's all I can say as far as that goes

"Mr. Brose: Thanks Bob

"Mr. Fridkis: I think I just met the guy personally a few times, I don't really know him. Well I was just talking to Jack and he asked me about it. He was working for you cause he had heard that he had told someone that he

had been working for you three or four weeks, you know

"Mr. Brose: No, if he had been working for anybody it wasn't The Tool Box

"Mr. Fridkis: o.k., that's all

"Mr. Brose: If he was, then he and Freddie had something going on the side. I didn't know him that long ago. In fact, it was Thursday or Friday that I talked to him the first time."